```
 1              UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF NEW YORK
 2

 3

 4  In re:                        .  Brooklyn, New York
                                  .  January 23, 2012
    OTR MEDIA GROUP, INC.         .
                                  .  11-47385
 6       Debtor.                  .  Calendar Time:
    . . . . . . . . . . . . . .      2:00 P.M.
 7

 8       [78] FIRST APPLICATION FOR COMPENSATION FOR
          GOETZ FITZPATRICK, LLP AS COUNSEL TO DEBTOR;
 9           FEES; 114,994.00, EXPENSES: 3,769.56

10      HEARING (RE:  RELATED DOCUMENT(S) 72 MOTION FOR
                   2004 EXAMINATION
11
              BEFORE HONORABLE ELIZABETH S. STONG
12

13  Attorney for Debtor:          GOETZ, FITZPATRICK
                                  One Penn Plaza
14                                New York, New York  10119
                                  BY:  GARY M. KUSHNER, ESQ.
15                                     SCOTT D. SIMON, ESQ.

16  Attorney for City of
    New York:                     NEW YORK CITY LAW DEPARTMENT
17                                OFFICE OF THE CORPORATION
                                  COUNSEL
18                                100 Church Street
                                  New York, New York  10007
19                                BY:  ALAN H. KLEINMAN, ESQ.
                                     BRIAN T. HORAN, ESQ.
20
    Attorney for United States
21  Trustee:                      U.S. DEPARTMENT OF JUSTICE
                                  OFFICE OF UNITED STATES TRUSTEE
22                                271 Cadman Plaza
                                  Suite 4529
23                                Brooklyn, New York  11201
                                  BY:  MARYLOU MARTIN, ESQ.
24

25
```

```
 1                                                      2

 2

 3
Attorney for Metropolitan
National Bank:                TANNENBAUM HELPERN SYRACUSE &
 4                            HIRSCHTRITT, LLP
 5                            900 Third Avenue
                              New York, New York  10022
 6                            BY:  WAYNE H. DAVIS, ESQ.

 7
Court Recorder Operator:      BERNADETTE TAYLOR
 8

 9
Court Transcriber:           CATHERINE ALDRICH
                             COMPU-SCRIBE, INC.
10                           2376 Cleveland Street
                             Bellmore, New York  11710
11

12

13

14

15

16

17

18

19

20

21

22
Proceedings recorded by electronic sound recording,
23 transcript produced by transcription service

24

25
```

THE CLERK:  Numbers 15 and 16 57 on the calendar, OTR Media Group, application for compensation and hearing re: 2004 examination.

THE COURT:  Good afternoon.

MR. KUSHNER:  Good afternoon, your Honor.  Gary Kushner, Goetz Fitzpatrick, counsel for the debtor.

MR. SIMON:  Scott Simon, Goetz Fitzpatrick, counsel for the debtor.

THE COURT:  Thank you.

MR. KLEINMAN:  Alan Kleinman, New York City Law Department.

MS. MARTIN:  Marylou Martin representing the United States Trustee.

MR. DAVIS:  Wayne Davis of Tannenbaum, Helpern Syracuse & Hirschtritt, on behalf of Metropolitan National Bank.

MR. HORAN:  Brian Horan, New York City Law Department.

THE COURT:  All right.  I'm glad to have you all here.

Mr. Kushner, let's hear from you first on the status.

MR. KUSHNER:  I was going to handle the fee application for Goetz Fitzpatrick, and Mr. Simon was going to

1  handle the 2004 application.

2          THE COURT:  That's fine.

3          MR. KUSHNER:  So does your Honor have a preference

4  of the order?

5          THE COURT:  Do we also have other matters on the

6  calendar?

7          MR. KUSHNER:  Yes.  There -- in OTR?

8          THE COURT:  Yes.

9          MR. KUSHNER:  No.

10         THE COURT:  I guess that's it, not status.  Unusual.

11  All right.

12         MR. KUSHNER:  I think that's on for the 14th, your

13  Honor.

14         THE COURT:  Let's take up the questions of the

15  compensation application.  There have been some issues

16  identified.  I'm hoping they've been worked out.

17         MR. KUSHNER:  They have not been worked out, your

18  Honor.  So if I may --

19         THE COURT:  Please.

20         MR. KUSHNER:  -- present the application?  Your

21  Honor, Goetz Fitzpatrick has filed its first interim

22  application for compensation and reimbursement of expenses

23  covering the period of August 25th of 2011, which was the

24  filing date, through November 30th, 2011.  It seeks $114,994

1  in fees, 3,769.56 in disbursements, for a total award of

2  $118,763.56. Notice of the application itself was sent to all

3  parties and creditors in interest, and the application along

4  with the notice was sent to the various parties that have

5  appeared in this case, including the parties that I believe

6  are in Court and the United States Trustee.

7  There has been one objection filed by the United

8  States Trustee which I'll address. I just want to go through

9  generally what happened involving Goetz Fitzpatrick's

10 retention. We received an initial retainer in early August,

11 about three weeks before, three and a half weeks before the

12 bankruptcy case in the amount of $65,000, and prior to the

13 bankruptcy filing we did some work primarily in connection

14 with resolutions with the city or negotiations with the city

15 and various work associated with litigation that was

16 ultimately filed in the Court and with the petition and

17 schedules in anticipation of having to file a petition on a

18 rather expedited basis.

19 We charged the pre-petition retainer, the amount of

20 $17,867 for services during that three and a half week period,

21 leaving a balance of the pre-petition retainer of $47,133.

22 We seek approval of that amount of money, the

23 retainer balance of 47,133 plus an additional request for

24 services rendered that we have received no compensation. That

1  totals $67,861 for fees and $3,769.56 for expenses, for a

2  total additional payment -- actual payment of $71,630.56.

3        I generally describe comprehensively in the

4  application the types of services that were performed.  This

5  Court already knows that a lot of the work that Goetz

6  Fitzpatrick has been required to do in connection with its

7  representation of the debtor has been in connection with

8  various litigations with the City of New York dealing with,

9  among other things, lift stay motions which are -- were more

10  than the ordinary garden variety lift stay motion.  They

11  involved complex issues of law and facts and what have you.

12        Ultimately that litigation, one proactive by the

13  debtor in the form of an adversary proceeding and one in the

14  context of the city's motion for stay relief, has been

15  resolved by the Court to some degree, which affords the debtor

16  some breathing spell as to the need to attend to litigation on

17  non-active sites which will spare the debtor some time and

18  expense in defending those claims by the city.  In other

19  words, the motions have been resolved to the point where the

20  city is continuing its enforcement of the sign laws as against

21  only active signs, which are certainly more manageable than

22  what the debtor had been dealing with prior to the bankruptcy

23  filing.

24        Other significant work that the debtor has done --

that Goetz Fitzpatrick has done on behalf of the debtor is
enter into extensive negotiations with Metropolitan National
Bank for a cash collateral stipulation.  The form of an
initial cash collateral -- interim cash collateral stipulation
was agreed to by order of this Court early on in the case, and
basically has been modified and amended to the point where we
will submit a second interim application on the February 14th
next hearing date for use of cash collateral, but during the
first interim period a significant amount of work was done
investigating Metropolitan National Bank's security interest,
dealing with budget requirements, dealing with ordinary types
of matters that are associated with cash collateral
stipulations.

          During the first interim application period Goetz
Fitzpatrick spent a significant amount of time working with
landlords who were obviously concerned with litigation that
the city had commenced against both the debtor and the
landlords in connection with leases for the locations where
the debtor advertises or places its advertisements on.  There
are approximately 18 I believe locations.  I can tell you that
I spoke -- I have spoken to substantially all of those
landlords dealing with updating them with respect to why we
filed for Chapter 11, what the events were ongoing in Chapter
11, dealing with other things such as lease assumptions and

1  lease rejections, extensions of time for assumptions of lease

2  or the rejections of leases, dealing with various claims that

3  each landlord had, dealing with multiple problems where the

4  city was involved in taking remedies during the Chapter 11

5  case, all of which I believe are summarized in greater detail,

6  your Honor, in the application itself.

7        Goetz Fitzpatrick has been involved with the process

8  of getting the retention of ordinary course professionals

9  approved by this Court.  In many regards, your Honor, the

10  debtor's business is highly regulated.  It involves a

11  compliance with not only the sign laws, but various other

12  types of zoning matters and things that are particular to the

13  administrative burdens of operating this type of business.

14        The debtor has used -- had used a number of

15  professionals prior to the bankruptcy filing.  Initially we

16  brought on an application on an ex parte basis to have those

17  professionals retained.  Through the comments of the United

18  States Trustee that ultimately wound up into a full-blown

19  hearing, but the work associated with getting these folks on

20  board in a manner that they felt reasonably assured that not

21  only would they be properly retained, but also be paid for

22  their services, that Goetz Fitzpatrick was integrally involved

23  in during the first interim application period.

24        Goetz Fitzpatrick attended a number of Court

hearings. All of those are laid out on pages eight and nine
of the application. We've dealt with various claims that have
been asserted against the estate, and then generally
throughout the application there's a number of broader
categories that we've dealt with.

The U.S. Trustee -- I guess I'll let the U.S.
Trustee deal with its objections. We filed a reply, your
Honor, to the UST objection, and if I may just defer a
response to the UST until the UST --

THE COURT: In a general way there's no doubt that a
lot of good work was done and had to be done early on.
There's I think a serious question about whether the case has
made all the progress that we'd all like to see it make or
have made at this point. The objections of the Office of the
United States Trustee struck me as fairly precise, and they
seem to aim at just over seven percent of the total amount
that you're seeking. I don't want to underestimate the
importance of $16,050, but I want to hear from Ms. Martin.
I'd like to know, to understand better whether the balance is
not objected to and whether it's contemplated from your
perspective, Mr. Kushner, and your firm's that the -- that
whatever amount is approved in response to this application if
you're seeking to have it not only approved, but also paid at
this time. If you think there's a basis to pay it, how that

1 would fit in the cash flow picture here.

2          Those are the kinds of questions that I see as
3 significant, fairly practical questions, and it may be that
4 they are also questions that are only focused on a fraction, a
5 small fraction --

6          MR. KUSHNER:  I didn't --

7          THE COURT:  -- seven percent --

8          MR. KUSHNER:  I didn't read the --

9          THE COURT:  -- of what's being sought.

10          MR. KUSHNER:  I didn't read the objection that way,
11 your Honor.  I read --

12          THE COURT:  It may be that more broadly with respect
13 to the progress and the cash flow situation there's also some
14 bigger concerns, but you know, lumping and multiple
15 attendance, these are issues that often I see counsel in the
16 United States Trustee's Office agree on ultimately with some
17 modification often in the position from both sides.

18          MR. KUSHNER:  I could deal with those aside, but as
19 you know, I typically have.  When I read the UST objection, I
20 read it that they requested that Goetz Fitzpatrick withdraw
21 the application in its entirety or in the very best case
22 scenario to be allowed a percentage of only the pre-petition
23 retainer, and no additional fees aside from the issues of
24 lumping and vagueness and what have you.

1    That is not acceptable to Goetz Fitzpatrick.  What

2  is acceptable to Goetz Fitzpatrick would be to give a blanket

3  percentage award to all of the application with an opportunity

4  to go back to the United States Trustee either on a short

5  basis or even at the next application for allowances to deal

6  with the specific objections to vagueness, lumping, and what

7  have you.  That I can do with the United States Trustee, and

8  we could take that off the top and reserve it or include it in

9  whatever percentage, but to just get approval for a less than

10 one hundred percent of the retainer and get nothing for the

11 four months worth of work is objectionable to Goetz

12 Fitzpatrick, your Honor.

13    THE COURT:  Well, it certainly does give us

14 something to talk about because I take all of your points and

15 I think they're supported by the record in many ways.  I also

16 don't see yet suggested in the record what is typical in some

17 situations to see as some idea of a holdback with respect to

18 approved fees, but an amount to be held back pending further

19 developments in the case and the ability to make the payments

20 and the appropriateness down the road.

21    So let's hear from Ms. Martin and see if we can make

22 some headway on this.

23    MR. KUSHNER:  Thank you.

24    THE COURT:  Thanks very much, Mr. Kushner.

1    MS. MARTIN:  Thank you, your Honor.  Your Honor, the

2  U.S. Trustee's objection -- overall objection is based upon

3  the debtor's financial condition.  The November operating

4  report indicates that the debtor has only $60,000 in cash.

5  The fee application seeks fees in excess of $100,000.  So

6  administrative insolvency is a real concern in this case.

7    So aside from the other objections we have with

8  regard to vagueness and excessive interoffice conferences and

9  lumping, and perhaps those are issues that can be resolved,

10  your Honor, but bigger -- the bigger concern is where is the

11  money coming from?  And if we can establish where the money is

12  coming from perhaps we could reach some sort of a resolution,

13  your Honor.

14    THE COURT:  Which might well include taking an

15  amount which would put to the side for the moment any amounts

16  related to unresolved issues, the specific issues that you've

17  identified, and then looking at that number incrementally,

18  some kind of an appropriate holdback and an understanding as

19  to when, from whence, and how payment would be made.  I think

20  that sounds like a very sensible way to proceed, and I'd

21  encourage the parties to take even a few minutes now to talk

22  about that at an appropriate interval in this afternoon's

23  hearing.

24    I think the practical questions are the basis for

1  the concerns which might sound theoretical.  If there's that

2  much money there, then you could take -- you could reach

3  either conclusion on whether the fee should be paid.  If the

4  money's not there then the question is what are we really

5  talking about?  So that's --

6          MS. MARTIN:  Your Honor, we've been told that the

7  November -- I'm sorry, the December operating report will show

8  that there's funds set aside apparently for legal fees,

9  however, that operating report has not been filed.

10          THE COURT:  When is it expected, Mr. Kushner?

11          MR. KUSHNER:  It's already been set aside, your

12  Honor.  We will --

13          THE COURT:  The operating report.

14          MR. KUSHNER:  It should have been in my hands before

15  this hearing.

16          THE COURT:  Agreed.

17          MR. KUSHNER:  I would gather some time either later

18  today or tomorrow.

19          THE COURT:  Soon.

20          MR. KUSHNER:  And I would have liked to have had

21  that operating report because I think it really is inapposite

22  to -- it would show that the U.S. Trustee's -- and I say this

23  respectfully, reading of the reports to date has been faulty

24  to some degree.

1        THE COURT:  Well, of course, that office can only

2   read what it has.

3        MR. KUSHNER:  That's right, but as it -- what it has

4   already is an operating report through November.

5        THE COURT:  And?

6        MR. KUSHNER:  And the debtor has in fact shown a

7   profit of roughly $450,000.  What the U.S. Trustee I don't

8   think into account, and again, I had a conversation with Mr.

9   Curtin, a very pleasant conversation.  A couple of things that

10  weren't taken into account, that I don't think were considered

11  by the United States Trustee, during the case of the case,

12  your Honor, the debtor has been paying $40,000 a month to

13  Metropolitan National Bank.  So I think it's five months that

14  were -- payments were made during -- through the December

15  period anyway.  Through the November period it was four

16  months, so that's $160,000 in cash that it would have had in

17  the bank.  The second thing that I think that the debtor --

18       THE COURT:  Except that it paid -- made payments it

19  had to make.  I'm not sure I understand how that argument

20  advances the ball.

21       MR. KUSHNER:  Well, in terms of administrative

22  insolvency this was done.  It's not administratively

23  insolvent.  Its cash flow has been effected to some degree by

24  these extraordinary expenses that are continuing to be made.

1      THE COURT:  How is paying the secured creditor an

2 extraordinary expense?

3      MR. KUSHNER:  Because -- because under the cash

4 collateral formula ordinarily all you need to do is give

5 adequate protection.  The collateral base has actually

6 increased, but as a condition for use on a consensual basis we

7 agreed to pay more than just adequate protection payments.  We

8 agreed to pay down a principal portion on a month to month

9 basis.  If you were just to go on a straight vanilla adequate

10 protection analysis where they would get theoretically

11 interest on their secured position, the payment would have

12 been actually close to about $6,000 a month.

13      So we're accommodating the lender in return for

14 consensual use in order to avoid a fight.  I don't think that

15 anybody would have a problem with that, but the cash flow

16 itself --

17      THE COURT:  No one does, and I wouldn't encourage

18 you to create one.

19      MR. KUSHNER:  No, no, no.  But so, and I also want

20 to point out that the debtor's accounts receivable balance as

21 of the petition date, as set forth in our reply, is roughly --

22 as of the petition date it was roughly $1,500,000 and I think

23 it was 77,000, it may have been $87,000.  It has now increased

24 to $1,877,000, some increase of about $300,000.

1          THE COURT:  Is the increase in the aged category or

2    in the --

3          MR. KUSHNER:  No.

4          THE COURT:  -- new category?

5          MR. KUSHNER:  This is all new.  This is all new.

6          THE COURT:  This is 30 days or less?

7          MR. KUSHNER:  That's right.  That's right.  These

8    are all good receivables.  I mean the debtor typically

9    contracts with triple A types of clients, Sony Corporation,

10   various large companies that do these massive billboards, so

11   the collection aspect has never been a problem.  It was

12   delayed somewhat at the beginning of the case when the filing

13   took place, which is typical -- a typical knee jerk type of

14   response.  "You're in bankruptcy.  We'll hold off on paying,"

15   but in effect if you take a look at the operating reports, the

16   debtor's sales have been strong and the accounts receivable

17   base have actually collected in December, which is the third

18   thing that I wanted to point out.

19         In December, pursuant to the agreement with

20   Metropolitan National Bank, we set aside $50,000 to be paid to

21   -- assuming that the Court would grant some or all of this

22   application, so that money's already been set aside, hasn't

23   effected the debtor's operations at all, okay, and is being

24   held in accordance with the budgets that have been approved by

Mr. Davis and myself or have been discussed by Mr. Davis and myself.

The last thing is we're not asking for 100 and -- I just want to get the right number, $114,000 payment. We've already received before the operating reports were even necessary 65, of which approximately 47,000 and change was already paid and we're holding in our accounts, so that really all we're asking for is $71,000, your Honor, in terms of an additional payment.

So you know, I think and I certainly respect the U.S. Trustee's concerned about the financial aspects or the financial condition of the debtor, but we've never taken the last nickel on a fee application to impair our clients from operating its business. We're talking about an approval and an assumption that these sums will be available and will not impair the debtor's ability to operate.

THE COURT: I think the operating report will be extremely helpful. It's not fair to you to have you recite chapter and verse of a document that you haven't seen yet, nor to expect the Office of the United States Trustee to proceed in a vacuum, especially where it sounds like the information will be supportive, will be helpful, and will bring current information that as of the moment is not especially helpful to the position you're arguing.

1    Who else would like to be heard on this?  I'd like

2  to hear any other -- hear any of the parties who would like to

3  be heard and then I'm inclined to ask Ms. Martin and Mr.

4  Kushner at the appropriate time, maybe after we get past the

5  next issue, to confer on this and see if we can come up with a

6  way to move forward.  I think it makes sense for there to be

7  some appropriate compliance with the UST requirements and

8  compensation for counsel's work since the petition date.  I

9  can anticipate a situation where issues would be addressed in

10  a way that something in addition to the retainer would make

11  good sense, but there's some questions here that need to be

12  answered before that can be reflected in an order I think

13  hopefully consensually.

14    Yes, from Metropolitan National Bank.

15    MR. DAVIS:  Thank you, your Honor.  Just a couple of

16  comments.  One, just based on Mr. Kushner's remark a few

17  moments ago that it's the debtor's position that the value of

18  my client, Metropolitan National Bank's collateral base has in

19  fact increased during the pendency of this case, that's

20  something that Metropolitan National Bank is not willing to

21  concede at this point.

22    THE COURT:  No, and I'm making no finding on either

23  direction on that.

24    MR. DAVIS:  A significant amount of the value of our

1  collateral was tied up in the particular lease locations, and
2  we'll talk a bit more about that I believe in the context of
3  the 2004 application, but how that value has been maintained
4  or in fact diminished during the pendency of this case, giving
5  the ongoing battle between the debtor and New York City, is a
6  significant, and I can't over-emphasize significant concern to
7  Metropolitan National Bank.

8          With respect to the fee application specifically,
9  while we did not file a response or an objection and leave it
10 in the good hands of the U.S. Trustee's Office, let's focus on
11 the form and the detail of the application itself.  It just
12 should be clear to all that the bank is -- shares the concern
13 that there appears to be little substantive progress made
14 toward the emergence of this debtor from Chapter 11 given what
15 will be next month six months in Chapter 11.  We'll talk about
16 that more, but it's a significant concern.

17         THE COURT:  I appreciate that.  Anything to say?
18         MR. KLEINMAN:  No comment, your Honor.
19         THE COURT:  All right.  All right.  So I think it
20 makes sense to set these issues aside for the moment, not
21 indefinitely of course I assure you, Mr. Kushner.  I think
22 it's important that lawyers be paid at the time and under the
23 circumstances that the Code and our Rules permit, and a lot of
24 work has gone into this case already.  I recognize that.  I

1 think these issues need to be addressed.  You need some

2 information in the hands of the Office of the United States

3 Trustee that they'll have very soon it sounds like.

4          I'd like to turn the page for a moment to the next

5 item on the calendar, which is the 2004 examination.  That's

6 your burden.  I'll hear first from your colleague, and I just

7 want to note for the record that I'm always pleased to hear

8 from the lawyer in the case who's most directly able to speak

9 to the issues, and invite whatever supplementation you as a

10 team decide makes sense.  So please, let me hear from you.

11          MR. SIMON:  Thank you, your Honor.  This is the

12 debtor's application to conduct an examination of specific

13 individuals employed by the city pursuant to Bankruptcy Rule

14 2004 to determine whether the sign laws have been selectively

15 enforced against the debtor.

16          The Court knows that the debtor is making every

17 effort to cooperate with the city.  OTR has stipulated to the

18 city's relief from stay to enforce violations on the signs

19 that the debtor is currently operating, but now as a debtor in

20 possession it's our obligation to investigate claims that

21 effect the debtor's estate, and the discovery requested if it

22 leads to litigation may have two effects if the city has

23 selectively enforced the sign laws.

24          First, the debtor could recover money damages and --

1          THE COURT:  Under what theory?

2          MR. SIMON:  Under --

3          THE COURT:  If the -- I want you to assume a clear

4    violation.  Does it matter if another entity engaging in the

5    same conduct was not cited?  It seems to me that even before

6    you get to the point of prosecutorial discretion it might be,

7    but it also might not be a defense or even more an affirmative

8    cause of action unless you can establish some sort of

9    invidious basis for the city's determination.  It may or may

10   not be a defense to the violation that there is what you've

11   called selective enforcement, and I don't -- I don't know what

12   the cause of action would be, but short of some kind of

13   invidious basis to the selective enforcement, if the

14   regulation has been violated is that -- how is that an issue

15   here?

16         MR. SIMON:  Well, the question that we have for the

17   Court and for the city in performing this investigation would

18   be whether there is invidious bad faith in putting OTR out of

19   business when the city has unquestionably in our view enforced

20   these sign laws against the debtor when the sign laws have not

21   been enforced against larger publicly-owned outdoor

22   advertising companies that have lobbied the city on their

23   behalf and against OTR.

24         THE COURT:  So the -- are you aware of a case that

1 defines, for example, a public company versus a closely-held

2 company as an invidious discrimination?

3          MR. SIMON:  I'm not aware at this time.

4          THE COURT:  Neither am I.  It would surprise me if

5 there were such a case I have to say.

6          MR. SIMON:  I mean what Mr. Kushner was just saying

7 is that in addition to the monetary damages, we also have a

8 potential claim for equitable subordination of the city's

9 existing claims.

10          THE COURT:  Is that the kind of thing that needs to

11 be addressed at this time in the case where the debtor's got a

12 lot of other issues on its plate, and the question of

13 administrative expense has already been raised?

14          MR. SIMON:  Well, considering that the city has

15 repeated to the Court, and the Court wants to know whether

16 this debtor's ability to emerge from Chapter 11 is dependent

17 in large part on whether the debtor has viable legal signs and

18 a viable business plan going forward.

19          THE COURT:  The debtor's been absolutely

20 unequivocal, and I've taken counsel at his word that the

21 debtor's only interest is in undertaking a legal business.  I

22 have no reason to doubt that's true.  I -- is the debtor still

23 not quite in good standing as a business?

24          MR. SIMON:  Well, the fact that the city has fought

1 so hard to continue its proceedings against the debtor's

2 existing signs would lead one to believe that the city is not

3 sure that the debtor's existing signs are viable and valid.

4 THE COURT: That's the city doing its job. Mr.

5 Simon, I asked a different question.

6 MR. SIMON: I'm sorry.

7 THE COURT: With respect to the fact that the OTR

8 was at one point, if I recall correctly the record, not in

9 good standing as a business, out of good standing. Is that

10 still the case?

11 MR. SIMON: I believe --

12 THE COURT: That may not be the issue you're most

13 involved with, so I'll look to Mr. Kushner. Are we making any

14 progress on that one?

15 MR. KUSHNER: Your Honor, Gary Kushner. You're

16 talking about the judicial -- the Secretary of State

17 dissolution by proclamation --

18 THE COURT: Yes.

19 MR. KUSHNER: -- issue? That is in the process of

20 being resolved.

21 THE COURT: Okay. You referred to the business

22 being a business in good standing, and I thought actually this

23 is the rare case where the business is not in good standing,

24 speaking very technically.

1     All right.  Mr. Simon, I appreciate your being

2 responsive to my questions.  I hope it gives you a sense of

3 the kind of concern I have here.  If there's discovery, Rule

4 2004 discovery separate from discovery that belong more

5 appropriately with the discovery tools in the adversary

6 proceeding that make sense here, then not only would I be

7 inclined to grant the relief and grant it promptly, but I

8 would assume that the city as a public actor, as a public

9 entity might even have disclosure obligations.  If there's

10 information about the regulatory process that it is required

11 to make available, then I wouldn't be surprised if without a

12 2004 order you could follow the appropriate procedures under

13 Freedom of Information type laws and get what you're seeking,

14 but invidious discrimination in the enforcement of the laws,

15 invidiously discriminating against a private company because

16 it is a private company?

17     MR. SIMON:  It's not necessarily, your Honor, that

18 the company is solely private.  It's also a upstart competitor

19 to large established entities that operate in the city.

20     THE COURT:  Some sort of anti-trust conspiracy among

21 your competitors that involves the city as a co-conspirator or

22 something?  That's pretty big stuff.  Is that really what

23 you're arguing?

24     MR. SIMON:  We're arguing that the existence of

signs that are operated by these other companies on property

that the city has agreed to enforce the sign laws against, and

two years after the city stated in open court that it would

enforce those sign laws against those entities, and as we

presented evidence in our reply papers, there have been no

violations against those signs.  It leads one to question --

there's an open question that we respectfully believe requires

discovery, and it is not as if the adversary proceeding that

is pending is at all related to these claims.

I mean the city objects that the adversary -- that

there is an existing adversary proceeding that requires --

that prohibits a 2004 examination, and the discovery that

we're requesting here is completely unrelated.  Moreover, the

adversary proceeding by stipulation and by the city's own

motion for relief from stay has been resolved.  There won't be

any discovery in that adversary proceeding.

THE COURT:  I think we can work our way through the

thicket of the interplay between 2004 and the discovery rules

that become part of the Bankruptcy Rules through the 7000

series and the incorporation of the discovery rules as a

process matter, but it's the substance that I really struggle

with here because I see not only a debtor with an awful lot on

its plate and really I don't yet perceive great time

sensitivity here in terms of "We have to do this now" or "We

can do it later," especially if it's more of a subordination
issue.  We don't know what that claim is yet.  We're working
on trying to get a number on that claim as I recall our prior
hearings, but the idea that the -- I think I would have to see
a fair amount indeed to -- for it to make sense, and I
question whether it makes sense from the debtor's standpoint,
although that's a job for the debtor's principals with the
advice of counsel in terms of which direction they want to
take this case, but to spend a lot of time and money on
investigating whether the city is in effect a collaborator in
a conspiracy to put the debtor out of business for any
competitive reasons or invidious reasons, as that term is used
in the law, typically includes some sort of impermissible
discrimination, and I'm just -- I don't see that in the
record.

I do appreciate that it is a -- I'll say we don't
yet have an entirely uncontentious relationship between the
city and the debtor.  The city is a significant regulator in
the world of the debtor's business, and the more productive
and substantive that relationship is, the better for this
case.  Does this move in that direction?  Arguably not.  Is
that a factor?  Is that an element under 2012 -- 2004?  Only
in the broadest sense, but those are some of the things I'm
thinking about.  I'm trying to understand better what the

1 claim or issue is separate from the adversary proceeding and

2 separate from the general disclosure that goes along with the

3 regulatory proceedings and Freedom of Information and those

4 kinds of things that you're looking to get here.

5 　　　　　I see in the words of your request, you know, things

6 that are so broad that if this order were entered I don't know

7 how the city could respond.  "All documents related to

8 studies, investigations, and deliberations prior to the

9 enactment of Local Law 31 on April 28th, 2005."  I can assume

10 that you probably mean "and that relate to," but you don't say

11 it.  "All documents concerning Ari Noe."

12 　　　　　MR. SIMON:  The principal of the debtor.

13 　　　　　THE COURT:  Well, his personal -- his New York City

14 tax filings?  I mean, and it goes on.  To me neither the

15 claims you seek the information in support of, nor the

16 requests themselves are sufficiently clear that I have a sense

17 I have a basis to make a decision that would require the city

18 to produce something in response to this, and I say this

19 knowing of the broad case law under 2004, knowing that fishing

20 is permitted, but also not aware of many cases -- none comes

21 to mind where in other than a maybe a tactical way a regulatee

22 who is a Chapter 11 debtor seeks this kind of relief against

23 an entity that's in effect a regulator.

24 　　　　　I'm not saying I don't understand the bigger

1 picture.  I think I do, but I don't -- I have those big

2 questions and I'm concerned.  Anyway --

3          MR. SIMON:  Well, your Honor --

4          THE COURT:  Please.

5          MR. SIMON:  The debtor seeks the examination of very

6 specific individuals.  You know, these are people that have

7 been intricately engaged in the enforcement efforts by the

8 city against this particular debtor, and it would be necessary

9 to ask these people the questions why, for example, the dozens

10 of violations against the debtor's signs have been, you know,

11 enforced and cited and litigated while similarly illegal signs

12 and the city's own sign laws have not been.

13          THE COURT:  Similarly illegal signs?

14          MR. SIMON:  Well, the signs that we presented in our

15 reply papers, they're -- we detailed why each of those signs

16 is illegal under the sign laws and --

17          THE COURT:  So is that in effect asking a government

18 actor to reveal its own thought processes about how it made

19 decisions in the exercise of its own judgment?  I'll assume

20 all your facts, that there are two similarly situation

21 situations -- I'm not speaking very precisely.  Let me

22 restate.  That in two comparable situations on the facts, the

23 debtor was cited and the neighbor was not, is that a defense

24 to the debtor?

1          MR. SIMON:  Well --

2          THE COURT:  I don't understand that.

3          MR. SIMON:  Your Honor, when --

4          THE COURT:  Short of something like invidious

5   discrimination, some kind of enormous conspiracy that in and

6   of itself breaks the law --

7          MR. SIMON:  When counsel for the city arrived today

8   they handed us an Appellate Division First Department case,

9   OTR Media against the City of New York, and I imagine it goes

10  toward --

11         THE COURT:  Have you read it?

12         MR. SIMON:  Yes, your Honor, I have.

13         THE COURT:  I haven't.

14         MR. SIMON:  Okay.  Does counsel --

15         THE COURT:  At least without having the cite I don't

16  know if it's among the cases I've read.

17         MR. SIMON:  I'm happy to hand up this copy.  Does

18  counsel have an extra copy for --

19         THE COURT:  And I'll get it, but I think you can

20  probably tell I've got some -- I have a couple layers of

21  concern.  The first is that -- and they don't include that

22  there's an adversary proceeding and we have 2004.  We can

23  manage that.  Whether you get this discovery, whatever

24  discovery you may be entitled to, and maybe it's nothing and

1  maybe it's something.  Whether you get it in this context or

2  that context it's a question of the name of the document and

3  the process that's required, less process actually if you're

4  dealing with a party in an adversary proceeding.  As you've

5  indicated, there's nothing in the way of discovery there

6  anyway.

7         So that's not an issue I'm so concerned about, but

8  why -- what this could lead to that would have value in any

9  way for the debtor that would move this case forward is

10 something I'm really struggling with, and whether and to what

11 extent it is a sensible of debtor time and effort I'd like to

12 understand better.  If you're entitled -- feel free to stay at

13 the podium.  You're doing a fine job.  It's just you got a

14 hard issue on your hands, Mr. Simon.

15        If you're entitled to the relief, and I might think

16 it might not make the most sense to go after the city like

17 this, it doesn't matter.  You're entitled to it.  In my case

18 management role I may have a different set of questions in

19 mind.  In my adjudicator on 2004 role it's different

20 questions.  You're welcome to confer.  I'll hear from Mr.

21 Simon.

22        MR. KUSHNER:  Can I --

23        THE COURT:  Mr. Kushner, you're welcome to add a --

24        MR. KUSHNER:  I want to see if I can --

1        THE COURT:  -- footnote or some context if you'd

2 like, and then I do need to hear from the city.

3        MR. KUSHNER:  I want to leave Mr. Simon here

4 because --

5        THE COURT:  I do too.

6        MR. KUSHNER:  But I want to give you a flavor, and

7 maybe it will give you the answer that you're looking for.  I

8 think your Honor four months into this case has a pretty good

9 understanding of what the debtor's business is.

10        THE COURT:  I hope so.

11        MR. KUSHNER:  So the debtor really attacks

12 relationships on two fronts.  One is the easel part where it

13 gets the places to promote the advertising from landlords.

14        THE COURT:  Mm hmm.

15        MR. KUSHNER:  And the other is the artistic part

16 where it goes outside to advertisers.  I mentioned Sony, BMW,

17 various large national types of advertisers who promote their

18 products where these sites are believed to have significant

19 value.

20        So let me give you a flavor of what the debtor's

21 problem has been as a result of what we believe to be the

22 selective enforcement.  Ari Noe goes to Sony Corporation in

23 Los Angeles and tries to get a program with Sony Corporation

24 which has been its biggest customer, and Sony Corporation says

1  to Mr. Noe, "Why should we advertise with you?  The city seems

2  to have something against you."  Viacom is -- Viacom is a

3  national large company, CBS is a large company.  Van Wagner is

4  a large company, all of which we've outlined their

5  significance to this application.

6          Sony will say, "These folks have similar signs on

7  locations across the street.  Why shouldn't we advertise with

8  them?  The city leaves them alone," and all of those signs are

9  pointed out in our reply to the city's opposition where the

10 city had mentioned to the Second Circuit I believe --

11         MR. SIMON:  The Appellate Division.

12         MR. KUSHNER:  The Appellate Division that it would

13 in fact two and a half years ago do the same type of

14 enforcements to the Van Wagner's, the Viacom's, and the CBS's

15 of the world.  They haven't done that.

16         The landlord has the same problem, public relations

17 problem with Mr. Noe and the debtor by saying, "Why should we

18 give our space to you, OTR, when every step that you take,

19 every step of the way there's a city violation?  We can't do

20 business that way."  Well, if we're doing something wrong, as

21 the city says, that's one thing.  That's already been

22 determined to be litigated in a separate court.  Those answers

23 certainly will be -- remain to be seen, but if the city is

24 doing something wrong, your Honor, in the way in which it

1  enforces laws that are supposed to apply to everybody in this
2  business evenly including the Viacom's, the Van Wagner's, the
3  Clear Channel's of the world, and we believe that there's a
4  basis to do it.  We just didn't throw a dart in the dark here.
5   We showed you examples of those things.
6          We would like to investigate why those applications
7  -- those signs are not being similarly enforced when we know
8  that there may be something wrong with those signs, not that
9  there's something wrong with our signs because we're defending
10 those, but we know that there's something wrong with theirs,
11 and it's preventing us from doing business in the marketplace
12 with not only advertisers, but with our landlords.  We have a
13 fiduciary duty on behalf of all creditors, landlords, vendors
14 that we hire, taxing authorities to pursue these types of
15 claims against the city for selective enforcement.
16         THE COURT:  Claims.
17         MR. KUSHNER:  Claims.
18         THE COURT:  Mr. Kushner, what is the cause of
19 action?  I don't understand the cause of action.
20         MR. KUSHNER:  The cause of action, certainly if
21 there's a violation of the selective enforcement statute under
22 Constitutional grounds there's a claim.
23         THE COURT:  What is the Constitutional claim?
24         MR. KUSHNER:  I'm not an expert in Constitutional

1  law, but I understand that under 42 U.S.C. 1983 there's not

2  only a cause of action, but there's a claim for damages and

3  treble damages.  Those are the types of the claims that could

4  be brought.

5         THE COURT:  I think you may have to brief those

6  issues.  I'm just not seeing here, and I'm also wondering is

7  this any kind of a sensible way for this debtor to be engaging

8  with the City of New York?

9         MR. KUSHNER:  Well, your --

10        THE COURT:  Which is causing your major perspective

11 clients to say, "You know, you have a terrible relationship

12 with the City of New York.  Why shouldn't be working with

13 somebody else because they have a good relationship with the

14 City of New York?"

15        MR. KUSHNER:  Judge, Judge, we -- I can -- we're

16 four months into this case.  We filed one litigation in order

17 just to get a semblance of some peace.  That was a declaratory

18 judgment that either the stay doesn't apply or it does apply.

19  That was what the litigation has been so far with the city.

20 We have sat down with the city to try to investigate ways in

21 which to settle the monetary claims and to get more even

22 keelness on the way in which the city are enforcing these

23 laws.

24        THE COURT:  You have a huge opportunity through this

case to shift the track perhaps of the debtor's working
relationship with the city from one that has been expensive
and comparatively unproductive for the business to one that is
less costly, less burdensome, and productive. That's status
more than it's --

    MR. KUSHNER: It's not going to happen with --

    THE COURT: -- 2004.

    MR. KUSHNER: -- the city, Judge, and as debtor's
counsel who's been involved on a day to day basis, it's not
going to happen your way, not because the debtor doesn't want
it. It's because we've been told that there is no ear that
hears on the other side. There's a mission here. Now we want
to get behind that mission. We have not fired the first
arrow. We are now in a position where we have tried to
negotiate. We're not using this as leverage. We're using
this as trying to investigate whether or not in the face of an
adversarial relationship to the city, which exists for
whatever reasons, we have an exit strategy from Chapter 11
either by affirmative claims against the city or by equitably
subordinating their claim because they didn't -- they did not
enforce the sign laws as they are required to do by way of
law.

    THE COURT: But would this -- assume hypothetically
that there should also be many other defendants in these kinds

1 of proceedings that would effect those business, but it would

2 not reduce by a farthing the amounts, through a process that I

3 assume withstands scrutiny, the city has found the debtor of.

4  I don't see how it changes your balance sheet to have -- if

5 you could successfully argue, you know, "They didn't ticket

6 the people across the street.  We think city inspectors on the

7 take."  I can't tell what you're suggesting because your

8 papers use --

9          MR. KUSHNER:  Because maybe the --

10          THE COURT:  -- a phrase, "selective enforcement,"

11 and cite the Second Circuit case, but don't -- I think I'm

12 going to need more perhaps both on the law and the facts, and

13 it's going to be your decision whether this is the time and

14 whether it's worth the effort, but to go down this path in the

15 management of this case.

16          MR. KUSHNER:  If you do not authorize some sort of

17 investigatory right, and the only way I think is appropriate

18 is through 2004 in this case, then this case might as well

19 convert tomorrow because the city is not going to, based upon

20 my experience of a bankruptcy lawyer who's been doing this for

21 25 years, they have not come or have shown a willingness to

22 come to the table to negotiate, period.  I'm stating that on

23 the record.

24          THE COURT:  Well --

1      MR. KUSHNER:  Perhaps the secured lender has

2 something to say about it, okay, but these debt -- this debtor

3 will lose its ability to operate a lawful business.  Perhaps

4 the city will think twice if the Court does authorize some

5 reasonable discovery under this case to allow the debtor to

6 investigate whether the city is at risk for permitting

7 violations of law that will help this debtor emerge from

8 Chapter.

9      THE COURT:  Well, what you are describing, and the

10 sort of precise and targeted inquiry that you propose strikes

11 me as different than what's in your papers, and the kinds of

12 things that you're suggesting as potential claims are not set

13 forth really in your papers in a way that gives me a basis to

14 appreciate that, yes, these are claims with elements that

15 courts have recognized in an appropriate record whether it's

16 the context of anti-competitive or corruption.  I don't know.

17  It's hard to tell what you're saying.

18      I can tell that there's a problem.  I can perceive

19 there's a problem, but I can't tell what kind or flavor of

20 problem.

21      MR. KUSHNER:  If you want me to identify the

22 remedies that are available if after discovery these facts

23 would support it, I'll be happy to supplement it.

24      THE COURT:  I think what I -- well, I have to think

1   about what makes sense as a next step.  I need to hear from

2   the city because of course these are very serious things that

3   you're identifying as issues or possible issues, and you do it

4   as a respected practitioner, each of you and officer of this

5   Court.

6           I'm concerned to hear that there is not yet any

7   productive engagement on the process side.  I will remind all

8   the parties that you have worked out in the context, for

9   example, of the stay relief and the going ahead of the city's

10  regulatory process as to existing signs.  The city's doing its

11  job as city in the public interest.  Things have actually

12  gotten worked out in this case.

13          MR. KUSHNER:  Except --

14          THE COURT:  Not easily, but they have.

15          MR. KUSHNER:  They worked out, your Honor, after

16  your Honor put the Court's touch on it.  Your Honor was the

17  one who decided the framework first before the city was

18  willing to concede that it --

19          THE COURT:  I know I'm going to interrupt you, and I

20  regret it, but no one conceded in those arrangements.  Neither

21  the debtor nor the city conceded.  You both did your jobs, and

22  if I helped then so much the better.

23          MR. KUSHNER:  You did.

24          THE COURT:  And I haven't exactly been quiet this

1 afternoon, so maybe I've given you some things to think about,

2 but I'm concerned both for the city's ability to do its job

3 productively and for the debtor's ability to continue to move

4 forward in reorganizing --

5          MR. KUSHNER:  This doesn't --

6          THE COURT:  -- about this -- about the way that this

7 is being approached.

8          MR. KUSHNER:  This doesn't effect the way that the

9 city does its job.  This -- the city's doing whatever it

10 thinks it's appropriate to enforce the sign laws, and I assure

11 you, your Honor, we're now attending hearings as a result of -

12 - in ECB courts as a result of new violations or purported

13 violations, and we're going forward with that process.  This

14 doesn't effect the way that the city's doing its job.  We're

15 not seeking to do that.

16          We're seeking to, certainly on the equitable

17 subordination claim, okay, if the city acted adverse to the

18 debtor's interest, okay, that is one basis to knock out a

19 claim.  That certainly aids our reorganization.

20          THE COURT:  Would you view it as adverse to the

21 debtor's interest to cite it for violations of law?

22          MR. KUSHNER:  No.

23          THE COURT:  I mean I suppose in some way technically

24 it is --

1          MR. KUSHNER:  No.

2          THE COURT:  -- but not in way that would lead to

3    subordination.

4          MR. KUSHNER:  No, no, no.  We're talking about --

5    about using the sign laws to effectively favor somebody else

6    in that same industry.  Forget about what the debtor did.

7    We're the red-headed stepchild, if you will, your Honor.

8    We're the ones who no matter what we put up, it's a violation.

9          THE COURT:  All right.  I'd like to hear from the

10   city.  I'd like you to think about these issues.  I'm going to

11   actually ask you to confer with each other, and I do think if

12   there's matters that -- the kinds of things that I still don't

13   see clearly enough on the record, I may try to be specific

14   about it in terms of where I want you to address further

15   issues because given the kinds of things that you're

16   suggesting this discovery be in support of, I don't see those

17   things in this record, and I see a very broad -- impracticably

18   broad request.

19         I'm wondering if there is some productive way to

20   improve the -- and expedite the process of information

21   exchange and dispute management between the city, and I don't

22   mean you're disputing now.  You're doing your jobs now, but

23   there are a number of proceedings out there, and how ever we

24   can best move those forward that's efficient for the city and

efficient for the debtor is a good thing.  I'm trying to
reflect on whether on our mediation register we have anybody
with significant administrative, in the sense of
administrative law experience who could help be a broker
almost to facilitate that process.

The city can't compromise on its regulatory role or
on the due process that the debtor will get, nor can the
debtor compromise unproductively its prerogative to defend
against allegations it believes aren't well founded, but that
doesn't mean there isn't a solution out there.

So let me hear from the city and then I'm going to
give some time to confer with each other.

MR. KLEINMAN:  Your Honor, I think you said better
than I could what the city's legal position with respect to
there is no cause of --

THE COURT:  I had the benefit of your papers.

MR. KLEINMAN:  Let me just tell you one vignette
because Mr. Kushner keeps saying things, I don't know directed
at me or directed at the city which I'm just -- is belied by
what's going on, so Mr. Holzer I think in November came over
to me and said, "Oh, by the way, here's the piece of paper
which shows that this particular sign is legal because it's
really stayed on property."  So I said, "Thank you very much,"
took it home.  I read it.  It didn't seem to support it.  I

1  wrote back to Mr. Holzer.  I said, "Doesn't seem to support

2  it.  What else do you have?" and after some very nasty e-mails

3  from them to me I asked them again to, "Well, what's your

4  legal basis here for saying that this sign is exempt from the

5  sign laws?" and now, I don't know, a month and a half later I

6  still don't know.

7           So my mode of practice, your Honor, in everything

8  for the last 33 years is where things can be worked out and if

9  there's a legal issue and I can be of assistance, I'd be happy

10 to be of assistance.  I have been knocking my head against the

11 wall to try and move forward with that.  That's one vignette.

12          The other vignette, you know, we have been trying

13 since the beginning of this case to understand what signs the

14 debtor currently owns, and I don't know if you recall, but

15 there was this long months period of time just to try and

16 figure out what that list is.

17          THE COURT:  The debtor, debtor and affiliated

18 entities, separate entities is common ownership.  I have a

19 general recollection of the record in that regard.

20          MR. KLEINMAN:  And so we got a list and then we've -

21 - we get calls from landlords who get the penalties, and we

22 now look at the schedule and we look at the list and they

23 don't match.  So we ask our adversaries politely in an e-mail,

24 "Please tell us what's going on."  So when Mr. Kushner

1  suggests that the City Law Department is somehow opposed to
2  trying to resolve things here, that's just not true and I take
3  personal offense from it, and I guess more --

4        THE COURT:  I appreciate that.  I think you each
5  authentically hold the views that you articulate.  We have a
6  lot of talent and experience in the room.  I would like to
7  improve on that situation and I --

8        MR. KLEINMAN:  Well --

9        THE COURT:  -- say that in a general way.

10        MR. KLEINMAN:  So I would --

11        THE COURT:  You're too good to misunderstand each
12  other at this basic a level.

13        MR. KLEINMAN:  So I don't know.  So just the
14  question of being able to ask questions to get answers without
15  the Court's intervention is something that would move things
16  along, and the other thing that would move things along
17  because it's not I who make determinations about the
18  lawfulness of signs, is what I've been trying to do from day
19  one is to move the process along so violations are issued and
20  the various adjudicatory bodies happen here, and as I point
21  out in my papers, what doesn't make any sense with respect to
22  this conspiracy claim is that there are multiple layers here.
23   I don't -- I couldn't even begin to understand how such a
24  conspiracy could be constituated because it's -- the sign

1 enforcement concerns the Department of Buildings, it concerns

2 the Environmental Control Board, it concerns ALJ's at the

3 Environmental Control Board, it concerns the Board that is the

4 Environmental Control Board.  It includes state courts which

5 have, you know, rights to review under Article 78.

6          So I don't even understand how such a conspiracy

7 could possibly take place given all these multiple layers, and

8 I guess that would implicate the Law Department in this

9 conspiracy because, you know, now that I'm involved after not

10 being involved in this for a couple of years, you know, I

11 guess I must be part of the conspiracy now too because there's

12 a conspiracy, but there is not one wit of evidence here to

13 support the conspiracy, and just to, you know, they talk about

14 the big corporate players who have petitioned the city.  Well,

15 so they enclosed some copies of drafts of e-mails to the city

16 in 2003 that corporations wanted to change the law.  Well,

17 they failed in changing the law.  In fact, the law became

18 tougher, and you know, then these big corporations sued the

19 city for several years.

20          So the notion that there's some conspiracy between

21 the city and these public corporations is completely,

22 completely fanciful.  The other big sign --

23          THE COURT:  That being said, it is not the first

24 time that a small or smaller than some business has been

1  frustrated, if frustration is an appropriate word here by a

2  regulatory process, so that's --

3          MR. KLEINMAN:  Right, but --

4          THE COURT:  It may not be actionable, but it is

5  something we should all care about.

6          MR. KLEINMAN:  Well, I would like for the

7  adjudications to move forward as quickly as possible and then

8  we will know -- I guess we still need to know what their sign

9  locations are and then we need to get adjudications and find

10 out whether they're lawful or not.  I mean that's not my

11 determination.  It's not mine to decide.

12         THE COURT:  It's pretty straightforward.

13         MR. KLEINMAN:  That's right.  It is very

14 straightforward.  So I'd just like to say one other thing.  I

15 think your Honor has put, you know, the nails in the coffin of

16 this claim, which is not really a claim, but I do want the

17 decision which Mr. Simon was referring to -- if I may

18 approach, your Honor?  It's just a decision in which --

19         THE COURT:  My courtroom deputy is right here.

20         MR. KLEINMAN:  So while OTR thinks --

21         THE COURT:  This is the case you've invited me to

22 look at.  Is that right, Mr. Simon?

23         MR. KLEINMAN:  I provided it to everybody, your

24 Honor.  So this is a -- the name of the case is <u>OTR versus the</u>

1  <u>City of New York</u>.  They were the plaintiff here, and they
2  challenged, you know, the application of the laws as to them
3  and they lost, and on --

4          THE COURT:  Was this as applied or was this a
5  Constitutional challenge --

6          MR. KLEINMAN:  Well, this was --

7          THE COURT:  -- under Central Hudson?

8          MR. KLEINMAN:  And so here's what the Court says,
9  and I'm reading on page 453 of the 83 Appellate Division
10 Reporter.  It's in there.  "We further hold that the subject
11 regulations and penalty schedule do not violate plaintiff's
12 right to equal protection.  The record is bereft of evidence
13 that the city selectively enforces the regulations and penalty
14 schedule against plaintiff and other similarly situated
15 outdoor advertising companies, but refrains from enforcing
16 them against government and quasi-government entities such as
17 the MTA, the Port Authority, and Amtrak," and then the
18 decision goes on to say, and I quote again, repeating your
19 Constitutional analysis, which I think is impeccable here,
20 quote, "In any event, plaintiff is not similarly situated to
21 any of these entities for purposes of equal protection
22 analysis."

23         So not only, your Honor, is -- are you completely
24 correct in your analysis that there's no claim here, but it's

1  also res judicata.  OTR --

2          THE COURT:  Well, this went to a different point.  I

3  take this case to be more the question of the governmental or

4  quasi-governmental, whether it was deference or exemption,

5  which is not the argument being made today, not even close.

6  It's a question of what has -- perhaps to be responsive to my

7  question because one likes to be responsive questions, some

8  kind of invidious discrimination, some kind of inappropriate

9  discrimination, some kind of big versus small or any

10 competitive behavior as opposed to what was perceived to be,

11 and I guess as a policy matter eventually was modified

12 exemption from governmental -- now reading from the decision,

13 "governmental and quasi-governmental entities such as the MTA,

14 the Port Authority, and Amtrak."

15         So anyway, yes, many of these issues do seem to be

16 well-traveled ground.  I leave it to the day that the parties

17 ask me to decide something in that context.  I still have the

18 question to what end?  Bigger in the case management context,

19 precisely in the claim that would have value for the case, if

20 the goal is to as a management matter get the city's

21 attention, you've completely done that.  To get the Court's

22 attention, you've done that too.

23         I'd like you to think about ways you can move this

24 forward.  I'm looking at a couple of our panel mediators who

have potentially relevant experience, including the former

chief of the Tax and Bankruptcy Group at the Southern District

U.S. Attorney's Office and of course, the former justice from

the Commercial Division of New York Supreme in New York

County, Herman Kahn, Justice Kahn, now I guess, attorney Kahn

has a lot of experience in being a dispute resolver.  Is there

an appropriate role for someone like that here?  I don't know.

 I don't know, but --

            MR. KLEINMAN:  Well, my door is open to Mr. Kushner

to talk about whatever to try and move the case forward.

            THE COURT:  And I want to --

            MR. KLEINMAN:  It is simply not my position to ever

practice otherwise.  In fact --

            THE COURT:  I'm glad to hear that.

            MR. KLEINMAN:  -- my style of lawyering is to try

and avoid being in court because once you're in court you've

already lost to some extent.  So I try and resolve everything

prior to court, and this is sort of -- this is a somewhat rare

experience for me to be --

            THE COURT:  Then this case --

            MR. KLEINMAN:  -- back at court litigating.

            THE COURT:  This case presents a rich opportunity

for you then, and I'm glad to know that.  We do have a lot of

conference rooms here in our large courthouse, and both the

courtrooms and the conference rooms are also used -- are often
used very effectively by the parties.  I think you have a
sense of the kinds of things that I'm focusing on here and the
steps I'm prepared to take.

I am not inclined to grant or deny the application
today.  I don't think I have enough before me in order to do
either, and any denial would be without prejudice of course.
There's no order that I would issue that would close the door
forever in a case of 2004.  I put a lot on the debtor's plate
for this break, which based on my schedule can't be terribly
long, both the compensation issues and some way forward on
these issues, authentic informational issues that will create
value for the debtor, move this case forward, that's what I
need to hear about, and maybe see more briefing on if it comes
to that.

Another venue for the frustration that the debtor
obviously feels in dealing with the city, I'm hoping we have
the right people in the room to make progress on that, and I
want to underscore something that was just said by corporate
counsel, talk, talking rather than e-mail may be a way to make
some progress here.  Listening may be even more productive,
and I don't say this in some sort of soft-hearted desire to
promote a soft solution to a hard problem.  I think it's
actually the hardest work you can do in the case.

1        So I'm going to give you a chance to do that.
2   Because of some limitations on my own schedule, though I want
3   to hear what you have to say, I'm not going to be able to
4   right this moment.  Let's go off the record briefly, talk
5   about scheduling for this afternoon, and then maybe I'll let
6   you get to it, but let's go off the record just so that we can
7   productively informal about scheduling.
8        MR. KUSHNER:  On this case, your Honor?
9        THE COURT:  On this case.
10       MR. KUSHNER:  Well, what I'd like -- I'd like to
11  take -- I think you were inviting some additional briefing.
12       THE COURT:  If we need it, but I'd like to go off
13  the record for -- just for figuring out how to use the next
14  hour or so.
15                    (Off the record/On the record)
16       THE COURT:  All right.  We're back on the record.
17  It's my sense with respect to case management that it may well
18  sense to carry these matters for a telephonic conference
19  within -- in the next week to two weeks to give the parties a
20  targeted opportunity to meet and confer directly on a way to
21  address the issues narrow and broad encompassed by the 2004
22  examination and all of the matters between the city and the
23  debtor, and then perhaps thereafter to carry the matters for -
24  - in person for further proceedings as appropriate on our

1  continued date of February 14th at 11:00.

2          Ms. Jackson suggests January 30th at 9:30 or 10:00

3  for that telephonic conference.  I think if that makes sense -

4  -

5          MR. KLEINMAN:  January 30 is not good for me, your

6  Honor.

7          MR. KUSHNER:  Nor I, Judge.

8          THE COURT:  Well see, we're getting agreement

9  already.  I'm glad to have characterized it in that way.  Is

10  it the week or is it the day?

11          MR. KLEINMAN:  The day.

12          THE COURT:  The 31st at 9:00?  That's a Tuesday, or

13  3:00.

14          MR. KUSHNER:  3:00 is okay.

15          THE COURT:  I think that should be fine.

16          MR. KLEINMAN:  I'm sorry.  What did he suggest?

17          THE COURT:  Tuesday, the 31st of January at 3:00

18  with the direction to confer in person before that.

19          Ms. Martin, anything to add?

20          MS. MARTIN:  Your Honor, my suggestion with regard

21  to the request for the fee application would be, you know,

22  we're willing to allow the debtor to take the pre-petition

23  retainer, and perhaps if we do adjourn it to this -- is this a

24  date for telephonic conference?

1        THE COURT:  Yes.  Yes.  January 31st.

2        MS. MARTIN:  Because by that time perhaps the

3 December report could be filed and --

4        THE COURT:  I'm sure it will.

5        MS. MARTIN:  -- perhaps our issues can be resolved

6 by then, your Honor.

7        THE COURT:  It certainly seems like it would be

8 filed by then.  If there is an interim order on consent that

9 gets us -- give everyone the confidence that the matter is

10 indeed moving forward on a consensual basis that you'd like to

11 submit between now and then, we'll take up the rest on the

12 31st.  Does that make sense?

13        MR. KUSHNER:  Yes, it does.

14        THE COURT:  Ms. Martin, can you work with that?

15        MS. MARTIN:  Yes, your Honor.

16        THE COURT:  Okay.  So granted in part on consent.

17 You'll submit an order on consent.  Little by little we'll

18 make the progress.

19        January 31st at 3:00.  That doesn't go in the

20 docket, but that will be telephonic.  Of course, if you'd like

21 to come to the courtroom you're always welcome to an elevator

22 ride as opposed to a trip, and as to the motion for the 2004

23 exam you're directed to confer in person on all of the issues

24 as reflected in the record if that's useful, and then mark

1  this over to 3:00 o'clock on January 31st.

2          Anything further on this matter?

3          MR. KLEINMAN:  We just want to reiterate that I am

4  happy to talk, and I think talking can make a lot of progress.

5   I just want to reiterate that I don't adjudicate signs for

6  the City of New York.  There's somebody else who does that,

7  and while I can help the process and maybe help with legal

8  issues, ultimately it's not for me to sit down with any

9  regulatee and work out the legality of their operations.

10          THE COURT:  A given, but it's absolutely clear to me

11 that you're here in the capacity as part of the solution as

12 opposed to part of the problem.  I see that as each of your

13 roles at this point, and I encourage you to take a few minutes

14 to get started, including with your calendars to figure out

15 when you're going to have that lunch.  Use my conference room

16 if you'd like.

17          Mr. Kushner, do you need to be here for the Azuka

18 matters?

19          MR. KUSHNER:  Yes.

20          THE COURT:  All right.  We have matters to follow,

21 so we're going to take a few minutes.

22          MR. KUSHNER:  If you can hear them, we'll be --

23          THE COURT:  We'll do them quickly and right now.

24          MR. KUSHNER:  Okay.

1          THE COURT:  We'll do them as quickly as we can and

2  right now.

3          Thank you very much.

4

5              *              *              *

6                      **CERTIFICATION**

7

8  I, Catherine Aldrich, certify that the foregoing is a correct

9  transcript from the electronic sound recordings of the

10 proceedings in the above-entitled matter.

11

12 _____          January 27, 2012

13          Catherine Aldrich