Goetz Fitzpatrick LLP
One Pennsylvania Plaza
44th Floor
New York, New York 10119
Tel. No. (212) 695-8100
Fax No. (212) 629-4013

By: Gary M. Kushner, Esq.

*Attorneys for OTR Media Group Inc.*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X

In re:                                                                    Chapter 11

OTR MEDIA GROUP INC.,                                Case No. 1-11-47385 (ESS)

                                    Debtor.
---------------------------------------------------------X

## SECOND INTERIM APPLICATION OF GOETZ FITZPATRICK LLP AS DEBTOR'S COUNSEL FOR ALLOWANCE OF COMPENSATON FOR PROFESSIONAL SERVICES RENDERED AND FOR REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES INCURRED

TO THE HONORABLE ELIZABETH S. STONG,
 UNITED STATES BANKRUPTCY JUDGE:

Goetz Fitzpatrick LLP (sometimes referred to herein as "GF"), counsel for OTR Media

Group Inc., debtor and debtor-in-possession (the "Debtor"), files its second application (the

"Application") pursuant to §§330(a) of title 11, United States Code (the "Bankruptcy Code") and

Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for allowance

of interim compensation for professional services performed and for reimbursement of expenses

for the period between December 1, 2011 and June 30, 2012 (the "Second Interim Period"). In

support of the Application, Goetz Fitzpatrick LLP respectfully represents as follows:

# I.   RELIEF REQUESTED

1.   By this Application, Goetz Fitzpatrick LLP, chapter 11 counsel for the Debtor, seeks entry of an order awarding (i) interim compensation in the sum of $203,142.50 for fees for professional services rendered during the Second Interim Period as counsel for the Debtor in this proceeding, and (ii) for reimbursement of disbursements made on behalf of the Debtor for the same period in the sum of $8,605.23 for a total award of $211,747.73.

### a)   Prior Application

2.   Prior to the Debtor's chapter 11 filing, GF received an initial retainer from the Debtor in the amount of $65,000.   Against the initial retainer, GF provided pre-petition professional services to the Debtor in the amount of $17,867.00 - primarily in preparation for the chapter 11 filing on August 25, 2011 (the "Filing Date").   As of the Filing Date, the balance of the initial retainer totaled $47,133.00 (the "Retainer Balance").

3.   By application filed with this Court on December 30, 3011 [ECF No. 78], GF requested interim compensation in the amount of $114,994.00 for fees and $3,769.56 for reimbursement of expenses covering the period between the Filing Date and November 30, 2011 (the "First Interim Application").

4.   By order dated February 17, 2012 [ECF No. 98], the First Interim Application was granted to the extent of awarding GF fees in the amount of $91,955.20 and expenses of $3,769.56 without prejudice to further request to payment of sums requested, but not awarded.

5.   GF has been paid in the sums awarded in the First Interim Application and will be seeking the remaining unawarded request for fees in the amount of $23,038.80 at a further hearing upon further application. For purposes of the First Interim Application, GF applied the

balance of its pre-petition retainer in the amount of $47,133.00 and was paid by the Debtor an additional $44,822.20 for fees and $3,769.56 for expenses.

## II.     JURISDICTION AND VENUE

6.     This Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§ 157 and 1334.  This is a "core" proceeding pursuant to 28 U.S.C. §159(b).  Venue of these proceedings and over this Application are proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

7.     The professional services for which allowances are sought by Goetz Fitzpatrick LLP in this application were rendered on behalf of the Debtor.

8.     A summary of the categories of services are required by the Office of the United States Trustee and the time devoted by Goetz Fitzpatrick LLP for each such service is annexed hereto as Exhibit "A".

9.     Goetz Fitzpatrick LLP also maintains records of the time it has expended for professional services on behalf of a client, as well as records for expenses that were paid on behalf of a client.  Goetz Fitzpatrick LLP's time records were made concurrently with the rendition of the professional service rendered for the benefit of the Debtor.  Each time entry made by Goetz Fitzpatrick is reflected on Exhibit "B" annexed hereto.

## III.     DEBTOR'S COUNSEL

10.     Goetz Fitzpatrick initially applied for retention as the Debtors' chapter 11 counsel on August 26, 2011 [See ECF No. 2] and renewed its application on October 5, 2011, on notice to all creditors and parties in interest at the request of the Office of the United States Trustee ("UST") [See ECF No. 36].

11.     The United States Trustee and other parties-in-interest objected to the proposed retention on the grounds that Goetz Fitzpatrick LLP's representation of certain of the Debtor's landlords in a section 1983 proceeding captioned in 203 17th Realty LLC v. City of New York, 11 CV 1392 (the "1983 action") could give rise to a conflict of interest [See ECF Nos. 40, 42 and 43].

12.     The Court held a hearing on the Application on October 25, 2011, at which time Goetz Fitzpatrick LLP's retention application was granted.

13.     The Court held a further hearing on the Application on November 29, 2011, at which time, the Court clarified the retention of GF as Debtor's counsel as reflected in the record and directed the Debtor to submit order on consent confirming that Goetz Fitzpatrick do no more work for the landlords in this case, or the 1983 action.

14.     The Office of the United States Trustee approved the form of Order submitted by the Debtor and an order granting GF's retention was entered by the Court on December 15, 2011, effective as of the Filing Date. A copy of GF"s retention order was annexed to the First Interim Application as Exhibit "C".

15.     Goetz Fitzpatrick is a law firm comprised of approximately thirty lawyers and paraprofessionals. Goetz Fitzpatrick is recognized as a leader in representing the construction industry. The firm is a leading force in sophisticated construction-related litigation, arbitrations and mediation. The firm's presence also extends to other industries in complex commercial litigation, transactional matters, trust and estates and general counseling.

16.     In 2011, Goetz Fitzpatrick recruited Gary M. Kushner, Esq., who formerly led the Bankruptcy Group at Forchelli, Curto, Deegan, Schwartz, Mineo, Cohn & Terrana, LLP. Mr. Kushner now heads the Bankruptcy Group at Goetz Fitzpatrick.

17. Goetz Fitzpatrick also employs Scott D. Simon, Esq. in its Bankruptcy Group. Mr. Simon is a former associate with the New York City law firms Cahill Gordon & Reindel LLP and Littleton Joyce Ughetta Park & Kelly LLP. Mr. Simon has prior experience drafting motions common to a chapter 11 case, research on complex and ordinary bankruptcy issues and has hands -on practice in bankruptcy litigation matters.

18. In connection with complex litigation matters that may arise in a chapter 11 case, GF utilizes the services of several highly experienced and extremely capable litigation lawyers including Ronald Coleman.

## IV.    FACTUAL BACKGROUND

19. On August 25, 2011, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

20. No trustee, examiner or committee of creditors has been appointed in this case.

21. The Debtor is a full service outdoor advertising company as defined by the New York City Administrative Code, now in its second decade of operation. The Debtor provides bulletins, wallscapes and spectaculars in prime real estate locations covering the New York City market. The Debtor also provides media sales and billboard maintenance services to its advertising clientele.

22. The Debtor's chapter 11 filing was precipitated by, among other things, fines and legal expenses in connection with New York City's promulgation and enforcement of zoning regulations that effectively banned the Debtor from maintaining certain signs (the "Sign Laws"). The fines, legal expenses, and loss of revenue has severely interfered with the Debtor's relationship with landlords of various buildings which are used to place outdoor signs. The

City's enforcement scheme has restricted the Debtor's available advertising sources and created substantial cash flow issues since the City served restraining notices on the Debtor's clients.

23. The chapter 11 filing was elected to obtain the benefits of the automatic stay and a breathing spell from the City's selective effort to put the Debtor out of business and to preserve the Debtor's relationships and assets for the benefit of its landlords, vendors, clients and other creditors.

## V. SIGNIFICANT SERVICES PERFORMED BY GOETZ FITZPATRICK LLP DURING THE FIRST INTERIM PERIOD

24. The following is a summary description of the significant services performed by Goetz Fitzpatrick LLP during the Second Interim Period. All of the professional services provided by Goetz Fitzpatrick LLP on behalf of the Debtor during the Second Interim Period are set forth in its time records (Exhibit "B" hereto) (the "Time Records"). The Court is respectfully referred to the Time Records for specific details of the work performed by Goetz Fitzpatrick LLP during the Second Interim Period.

25. In summary fashion, the work performed by Goetz Fitzpatrick during the Second Interim Period has been classified in several general categories as follows:

a. "Asset Disposition", which is generally described as the work necessary to counsel the Debtor and assist the Debtor with the potential sale of the Debtor's signs. The majority of sale negotiation efforts overlaps with case administration and business operations and were billed under both of these categories.

b. "Business Operations", which is generally described as the work necessary to counsel the Debtor in its business decisions. Services rendered in this category primarily included negotiations with the Debtor's landlords concerning operations, discussions with service providers regarding the automatic stay and continuation of services and negotiations with creditors concerning litigation with the City of New York.

c. "Case Administration", which is generally described as the work necessary to counsel the Debtor about its responsibilities as a debtor in a chapter 11 case; attending to scheduling issues; updating creditors with respect to miscellaneous

inquiries; reviewing operating reports and review of other financial information during the First Interim Period.

d. "Court Hearings", which is generally described as the work necessary for scheduled hearings, coordinating hearings with creditors, preparing hearing agendas, and attending court hearings.

e. "Claims Administration and Objections", which is generally described as the work necessary to evaluate the merits of claims filed against the Debtor's estate and developing the basis of any objections thereto.

f. "Professional Retention", which includes the work necessary to secure approval of the retention of professionals.

g. "Cash Collateral" includes time spent securing debtor-in-possession financing sources and approval for use of cash collateral.

h. "Legal Motions" which is generally described as the work necessary to prepare motions before the Court.

i. "Plan and Disclosure Statement" which is generally described as the work necessary to prepare the Debtor's plan and disclosure statement.

j. "Legal Research" which is generally described as the legal work associated with the preparation of legal points and authorities to support or oppose motion practice, as well as legal research on a myriad of other legal issues that affect the administration of the chapter 11 case.

## A.   <u>Asset Disposition</u>

26.   During the Second Interim Period, Goetz Fitzpatrick LLP spent time with Ed Burnbaum, a partner at Novack Burnbaum Crystal, LLP, Debtor's special counsel, attempting to evaluate proposals for the purchase of one or more of the Debtor's sign locations.

27.   Goetz Fitzpatrick LLP has also entertained telephone calls and attended meetings with representatives of other entities who have expressed interest in acquiring one or more of the Debtor's signs.

28.   In connection with this service category, Goetz Fitzpatrick also met on several occasions with the Ari Noe, the Debtor's principal, and Mr. Burnbaum to discuss alternatives to

the sale(s) of the Debtor's signs and to incorporate the disposition of assets/signs into the context of a plan of reorganization which was filed with the Court on June 22, 2012 [ECF No. 179].

29.     Time was also spent in discussions with the City to negotiate the removal of certain sign locations. Ultimately, the City and the Debtor entered into a stipulation and consent order, in settlement of the UST's motion to convert or dismiss the chapter 11 case, (discussed below), which involved voluntary sign disposition and removal.[1]

## B.     Business Operations

30.     The Debtor filed its petition in part to stay the City's selective enforcement of the Sign Laws, which enforcement threatened to put the Debtor out of business.

31.     The Debtor requested that Goetz Fitzpatrick LLP assist it in making various business decisions which affect the Debtor's relationship with a number of landlords.

32.     GF also provided general business counseling to the Debtor which became necessary as a result of the numerous administrative burdens that typically arise during a chapter 11 case.

## C.     Case Administration

33.     Since its retention, Goetz Fitzpatrick LLP has endeavored to ensure that the Debtor has timely complied with its duties and with Court deadlines during the Second Interim Period.

34.     Goetz Fitzpatrick LLP has responded to many creditor inquiries about the status of the chapter 11 case. Goetz Fitzpatrick LLP has responded to the inquires of many entities who have conducted due diligence in connection with the potential purchase of the Debtor's signs.

---

[1] Some of the services provided by Goetz Fitzpatrick in this regard overlapped with business operations and motion practice and was included in those categories as opposed to asset disposition.

35. Goetz Fitzpatrick LLP has insured that proper notices have been generated during the Second Interim Period, including noticing of Court calendars and adjournments.

36. During the Second Interim Period, GF routinely responded to various inquiries from the Debtor and other parties in interest about case developments, general case administration and other aspects or events which have occurred in the chapter 11 case.

## D. Court Hearings

37. During the Second Interim Period, Goetz Fitzpatrick LLP was required to prepare for and attend several Court conferences and hearings including:

    (a) status conference hearing on Debtor's motion for use of cash collateral, hearing on Debtor's application to retain Goetz Fitzpatrick LLP, hearing to extend exclusivity, and hearing to extend time to assume or reject real estate and sign leases which were heard by the Court on December 15, 2011;

    (b) status conference, hearing on Debtor's motion for an examination of the City of New York under Bankruptcy Rule 2004 and hearing on First Interim Application, which were heard by the Court on January 23, 2012;

    (c) status conference, hearing on Debtor's motion to use cash collateral and hearing on the Debtor's Rule 2004 application which were heard by the Court on February 14, 2012;

    (d) status conference, hearing on Debtor's application to use cash collateral and on the motion for Rule 2004 examination of the City, which were heard by the Court on February 23, 2012.

    (e) hearing on Debtor's second application to extend exclusivity, which was heard by the Court on March 6, 2012;

(f) hearing on status, Debtor's motion to use cash collateral and Debtor's motion for a Rule 2004 examination of the City which were heard by the Court on April 3, 2012;

(g) hearing on status, Debtor's motion to use cash collateral and motion to extend time to assume or reject leases of non-residential real property which were heard by the Court on April 20, 2012;

(h) hearing on status, Debtor's motion to use cash collateral, Debtor's first omnibus motion objecting to claims and motion to extend time to assume or reject leases which were heard by the Court on May 10, 2012; and

(i) hearing on status, Debtor's application to pay compensation to ordinary course professionals, Debtor's applications to employ special appellate counsel and accounting firms and UST's motion to convert or dismiss which were heard by the Court on June 29, 2012.

38.     Before each and every Court hearing, Goetz Fitzpatrick LLP diligently prepared the client (when necessary), prepared and extensively reviewed pleadings and other documents and generated research memoranda in order to prepare responsive pleadings and prepare for oral argument before the Bankruptcy Court.

**E.     Claims Administration/Objections**

39.     In connection with this category, Goetz Fitzpatrick LLP was required to deal with various landlord claims asserted against the Debtor; identity claims against which the Debtor intended to file claims objections; and evaluate the nature of claims asserted by the City and various taxing authorities.

40.     In connection with this category, Goetz Fitzpatrick LLP worked with the Debtor, and the City to discuss possible resolution of the City's myriad proceedings against the Debtor.

41.     In addition, during the Second Interim Period, the Debtor filed its first omnibus motion objecting to claims. In connection with that motion, Goetz Fitzpatrick responded to various responses from the applicable creditor, resolved several of the claims which were the subject of the motion and has continued to negotiate claims which could not be originally settled.

## F.      Fee Application/Attorney Retentions

42.     Goetz Fitzpatrick LLP prepared and filed its own retention application and order.

43.     Goetz Fitzpatrick LLP also prepared and filed the application to employ Novack Burnbaum Crystal LLP as special counsel to the Debtor.

44.     Goetz Fitzpatrick LLP also prepared and filed the application to retain ordinary course professionals.

45.     Goetz Fitzpatrick prepared the retention application of Whiteman, Osterman & Hanna, LLP as special appellate counsel.

46.     Goetz Fitzpatrick prepared the retention application of Pease Associates as Debtor's accountant.

47.     Goetz Fitzpatrick prepared the retention application of Bryan Cave, LP as Debtor's special regulatory counsel.

48.     Goetz Fitzpatrick prepared and filed the fee submissions applicable to ordinary course professionals.

49.     The filing of the foregoing submissions and applications resulted in the filing of objections by the UST and other parties in interest.  GF researched the legal issues applicable to each objection, prepared replies and ultimately resolved the issues raised by each objecting party.

## G. Cash Collateral

50. During the Second Interim Period, Goetz Fitzpatrick has worked closely with its secured lender, Metropolitan National Bank ("MNB"), and arranged for use of the bank's cash collateral so that the Debtor could continue to operate in chapter 11.

51. During the Second Interim Period, Goetz Fitzpatrick successfully negotiated budgets with MNB covering the months of December 2011, January 2012, February 2012, March 2012, April 2012, May 2012, June 2012 and July 2012.

52. During the Second Interim Period, Goetz Fitzpatrick reviewed, edited and successfully negotiated a Second, Third and Fourth Interim Cash Collateral Stipulation and Order between the Debtor and MNB which were each approved by the UST and the Court.

## H. Specific Motions and Contested Matters

53. Goetz Fitzpatrick LLP prepared several critical motions during the Second Interim Period which became necessary for the proper administration of the Debtor's case, including:

      (a) Debtor's application to employ various professionals who perform services in the ordinary cause of its business [ECF No. 51];

      (b) Debtor's motion to extend time to answer or reject leases of non-residential real property [ECF No. 56];

      (c) Debtor's first motion to extend exclusivity to file a plan and solicit plan acceptance [ECF No. 57];

      (d) Debtor's motion to employ Novack, Burnbaum & Crystal LLP as special counsel [ECF No. 62];

      (e) Debtor's motion to establish a bar date for the filing of claims against the estate [ECF No. 68];

(f)     Debtor's motion for an order authorizing a 2004 examination of the City of New York and related discovery [ECF No. 72];

(g)     Goetz Fitzpatrick LLP's First Interim Application [ECF No. 78];

(h)     Debtor's second motion to extend exclusivity to file a plan and solicit plan acceptance [ECF No. 95];

(i)     Debtor's second motion to extend time to answer or reject leases of non-residential real property [ECF No. 105];

(j)     Debtor's first omnibus motion objecting to claims filed against the estate [ECF No. 107];

(k)     Application for extension of Whiteman, Osterman & Hanna, LLP as Debtor's special appellate counsel [ECF No. 156];

(l)     Application for retention of Pease & Associates as Debtor's accountant for purposes of tax return preparation [ECF No. 160];

(m)     Application for extension of Roth & Company LLP as Debtor's general accountant and tax claim consultant [ECF No. 162];

(n)     UST's motion to convert or dismiss chapter 11 case (the "UST Motion") [ECF No. 154]; and

(o)     Application/order for hearing on the adequacy of the Debtor's disclosure statement ("Disclosure Statement") [ECF No. 198].

## I.     Detailed Work on Particular Motions

### a)     First and Second Motions to Extend Exclusivity [ECF Nos. 57 and 95]

54.     Pursuant to §1121(d) of the Bankruptcy Code, the Debtor is bestowed with the exclusive right to file a plan of reorganization/liquidation for the first 120 days following the

filing of a bankruptcy petition (the "Exclusivity Period"). The Exclusivity Period may be further extended under the Bankruptcy Code for cause shown.

55.      By application dated November 28, 2011 [ECF No. 57], the Debtor moved to extend the Exclusivity Period to file a plan of reorganization/liquidation and solicit acceptances thereon pursuant to §1121(d) of the Bankruptcy Code (the "Exclusivity Motion"). Without an extension of the Exclusivity Period, creditors, parties in interest and other entities were free to file a plan of their own.

56.      Pursuant to the Exclusivity Motion, the Debtor sought to extend the Exclusivity Period from December 23, 2011 to February 22, 2012 to file a plan, and to April 23, 2012 to solicit acceptance of its plan.

57.      By order dated December 28, 2011, the Bankruptcy Court approved the relief requested in the Exclusivity Motion and extended the Exclusivity Period for the Debtor to file a plan to February 23, 2012 and to solicit acceptances until April 23, 2012, without prejudice to further requests for additional extensions [ECF No. 77].

58.      By second application dated February 10, 2012, the Debtor further moved to extend the Exclusivity Period through June 25, 2012 (the "Second Exclusivity Motion") [ECF No. 95].

59.      By order dated March 7, 2012, the Bankruptcy Court approved the Second Exclusivity Motion.

60.      On June 22, 2012, Goetz Fitzpatrick completed the Debtor's plan and disclosure statement and caused these documents to be filed.

   b)      **Motions to Extend Time To Assume or Reject Leases**

61.     The Bankruptcy Code requires a debtor to assume or reject leases or executory contracts and, with respect to leases for non-residential real property – a debtor must assume or reject within 120 days of the filing of the bankruptcy petition in the absence of any approved request for an extension. Regular leases or executory contracts can be assumed on or before confirmation of a plan unless a party to such agreement moves to compel an earlier assumption or rejection and such request is approved by an order of the Bankruptcy Court, after notice to creditors and hearing thereon.

62.     By application dated November 28, 2011, the Debtor sought entry of an order extending the deadline to assume or reject certain leases of non residential real property and certain sign leases pursuant to §365(d)(4)(B) of the Bankruptcy Code for a period ninety (90) days until March 23, 2012 (the "Lease Extension Motion").

63.     By order dated December 28, 2011, the Bankruptcy Court granted the Lease Extension Motion and extended the Debtor's period to assume or reject to March 23, 2011, subject to further extension by order of the Court.

64.     By application dated March 16, 2012, the Debtor filed a second application to extend its time to assume or reject leases of non-residential real property and certain sign leases until confirmation of a plan of reorganization (the "Second Lease Extension Motion") [ECF No. 105].

65.     On April 13, 2012, Care Realty, one of the Debtor's landlords associated with a sign lease, filed an objection to the relief requested in the Second Lease Extension Motion (the "Care Realty Objection") [ECF No. 115].

66.     A second objection by a landlord to a sign lease was filed in connection with the Second Lease Extension Motion by Covenant House [ECF No. 117] (the "Covenant House

Objection", and together with the Care Realty Objection, collectively referred to as the "Lease Extension Objections").

67. Each of the Lease Extension Objections challenged the right of the Debtor to extend the sign leases in light of the fact that more than 210 days had passed since the Petition Date. The position taken in the Lease Extension Objections is essentially that the Care Realty and Covenant House leases had already been rejected by operation of law.

68. On April 18, 2012, the Debtor filed its omnibus reply to the Lease Extension Objections (the "Lease Extension Reply") [ECF No. 121]. In its Lease Extension Reply, the Debtor provided compelling legal authority supporting its claim that the Leases are not deemed to be leases of non-residential real property. Consequently, it was the Debtor's position in response to the Lease Extension Objections that the Leases for Care Realty and Covenant House (as well as all of the other Leases) were not automatically rejected by the Debtor because they were not assumed within a 210 day period from the Petition and the Debtor's time to assume or reject those Leases could be extended as a matter of law until the hearing on confirmation of the Plan.

69. In light of the Lease Extension Reply, (researched and prepared by Goetz Fitzpatrick), the Covenant House Objection was settled by stipulation which has been approved by the Bankruptcy Court (the "Covenant House Settlement") [ECF No. 168].

70. In summary, the Covenant House Settlement permits the Debtor to defer assumption of the Covenant House lease pending the outcome of Debtor's appeal of a decision by the ECB which denied OTR the right to put a sign on the Covenant House property. The Debtor's appeal is being prosecuted and there is no decision as yet. If the Debtor is successful in

its appeal, it will assume the Covenant House lease. Conversely, denial of the appeal will cause the Debtor's rejection of the Covenant House Lease.

71.     Similarly, the Care Realty Objection was resolved on other terms, which include the agreement of Mr. Noe to cause the chapter 11 filing of Underwood Realty, an affiliate of the Debtor, which is the named party on the Care Realty Lease. The Underwood chapter 11 petition is currently being prepared.

### c)     2004 Application

72.     As set forth in greater detail above, the Debtor has reason to believe that the City's enforcement actions have been unlawfully selective, are part of a scheme that, contrary to law and conducted under color of governmental authority, wrongfully deprives the Debtor of its rights and property as well as that of those with whom the Debtor does business, and that the City's actions and policies are calculated solely to eliminate Debtor's lawful business.

73.     In order to discover all of the facts to support this claim, the Debtor sought authorization from the Bankruptcy Court to conduct an examination of certain individuals employed by the City pursuant to Bankruptcy Rule 2004 and to request the production of documents (the "2004 Application") [ECF No. 72]. The Debtor's reasons for the 2004 Application were numerous.

74.     First, a 2004 examination would enable the Debtor to confirm the existing record indicating that the City has exempted from enforcement of the new City Zoning Resolutions outdoor advertising signs located on property owned by the City, MTA, and the Port Authority, unlawfully making the Debtor's outdoor advertising opportunities uncompetitive with those offered by such agencies and affecting the Debtor's financial and competitive position and, concomitantly, its ability to satisfy its obligations to its creditors.

75.     Second, the 2004 examination would enable the Debtor to determine whether, and to what extent, the City has enforced and issued and enforced notices of violation with respect to outdoor advertising displays owned or placed by outdoor advertising companies similarly situated to the Debtor. Such information would enable the Debtor to confirm the existing record and inferences therefrom suggesting that the enforcement of the new City Zoning Resolutions by the City has departed from the variation that might be expected as part of any municipal regulatory enforcement program and has instead purposely and unlawfully focused on signs owned by the Debtor, to the detriment of its business and its creditors.

76.     Third, the facts elicited through the 2004 examination would allow the Debtor to determine whether to commence an action challenging the constitutionality of the new City Zoning Resolutions and the City's enforcement thereof on various grounds.

77.     The 2004 Application was vigorously opposed by the City [ECF Nos. 79, 96 and 110]. The Debtor also filed numerous supplemental submissions in further support of the relief requested in the 2004 Application [ECF Nos. 83, 92, 93, 99 and 108].

78.     After several intensive hearings before the Bankruptcy Court (see above), the 2004 Application was denied [ECF No. 112].

79.     Notwithstanding the denial of the discovery sought of the City by way of the 2004 Application, the Debtor is still evaluating the merits of potential causes of action against the City. Goetz Fitzpatrick believes that the time and effort dedicated to the Rule 2004 motion has resulted in the City's willingness to negotiate a resolution of certain sign violations, permitting issues and a settlement of the City's money claim against the Debtor, providing a significant benefit to the Debtor, its estate and otherwise serves to enhance the Debtor's ability to successfully emerge from chapter 11.

### d)     Retention of Professionals

80.     Section 327(a) of the Bankruptcy Code provides that a debtor, with Bankruptcy Court approval, may employ one or more professional persons that do not hold or represent an interest adverse to a debtor's estate and that are "disinterested" persons. Because of the intensive regulatory scrutiny applicable to all outdoor advertising companies, the Debtor has been forced to utilize a plethora of attorneys, each with diverse and differing expertise, to deal with the litany of regulatory and litigation issues which faced the Debtor. During the course of the chapter 11 case, the Debtor has also retained various professionals to assist it in carrying out its duties under the Bankruptcy Code which have affected the Debtor's business and assets.

### (i)     Retention of Chapter 11 Counsel

81.     By application dated October 5, 2011, the Debtor sought approval of the Bankruptcy Court to retain GF as its chapter 11 counsel in this case [ECF No. 36]. By order entered by the Bankruptcy Court on December 16, 2011, the retention of the GF as Debtor's chapter 11 counsel was approved. [ECF No. 69]. The retention of GF was approved after settlements were reached with the UST, MNB and the City who each filed objections of the GF retention application (see above).

### (ii)     Retention of Ordinary Course Professionals

82.     The Debtor's business model requires the use of numerous regulatory lawyers, expediters, consultants and other professionals who specialize in handling the myriad of regulatory work particular to the new City Zoning Resolutions – both as to substantive aspects of these laws and the enforcement proceedings that emanate from these rules. The Debtor uses these professionals daily in connection with the ordinary course of its business activities for

purposes of representation in various ECB hearings and other administrative proceedings (the "OCP Professionals").

83.     By application dated November 15, 2011 [ECF No. 51], the Debtor sought approval of the Bankruptcy Court to employ the following Ordinary Course Professionals: (i) the Law Office of Ariel S. Holzer, PLLC ("Holzer"); (ii) Novack Burnbaum Crystal LLP ("NBC"); (iii) Bartfield & Knopfler PLLC ("BK"); (iv) Goldman Harris LLC ("GH"); and (v) Cohen Hochman & Allen ("CHA") as the Debtor's OCP legal team (the "OCP Application").[2]

84.     On November 23, 2011, MNB filed an objection to the OCP Application [ECF No. 53]. On December 14, 2011, the UST also filed an objection to the OCP Application [ECF No. 66].

85.     The foregoing objections to the OCP Application were withdrawn after a resolution was reached between the Debtor, MNB and the UST Goetz Fitzpatrick was instrumental in achieving a settlement of the objections raised by the UST and MNB. In summary, the OCP Professionals agreed to have their monthly compensation capped at various limits, depending on the projected workload of each professional. All fees incurred over the "cap" would be paid only upon formal application to the Bankruptcy Court, after a hearing on notice to creditors and parties in interest. Under this protocol, OCP Professionals would submit their respective bills on a monthly basis to various entities including the Debtor, UST and MNB, with an opportunity to object. After the objection period, the Debtor was authorized to pay 80% of fees which were not objected to, and 100% of expenses not objected to. Fees which were objected to were held back, and could be sought by way of formal application.

---

[2] There were several other OCP Professionals listed in the OCP Application who were not lawyers and for whom the UST did not require the Debtor to obtain a special application for retention.

86.     An order was entered with respect to the OCP Application on April 24, 2012 [ECF No. 128] authorizing the foregoing protocol.

87.     Goetz Fitzpatrick was also directly involved during the Second Interim Period in negotiating and finalizing disputes as to the payments due to the OCP Professionals, without which, the Debtor faced the possibility of withdrawals.

### (iii)     Miscellaneous Retention Applications[3]

### Whiteman Osterman & Hanna, LLP ("WOH")

88.     By application dated May 22, 2012 [ECF No. 156], the Debtor sought to retain WOH as special appellate counsel (and applicable regulatory matter) relating to the Debtor's sign at 838 Sixth Avenue, New York, NY.

### Roth & Company LLP ("RC")

89.     By application dated May 29, 2012 [ECF No. 162], the Debtor sought to retain RC to negotiate the tax claims filed in the chapter 11 case to perform prospective accounting work such as preparation of future tax returns.

### Pease & Associates, Inc. ("PA")

90.     By application dated May 25, 2012 [ECF No. 160], the Debtor sought approval to retain PA to prepare delinquent tax returns for the calendar years 2009 and 2010.

91.     On June 21, 2012, the UST filed an objection to the pending retention applications of NOH, RC and PA [ECF No. 175].

92.     The Bankruptcy Court will heard and determined the pending applications and the UST Objection on July 17, 2012 and these retentions were approved.

---

[3] The applications listed in this category were each objected to by either the UST or MNB. Ultimately, Goetz Fitzpatrick negotiated resolutions of these objections during the Second Interim Period and the Court subsequently approved these retentions at a hearing held on July 17, 2012.

**e)** **UST Motion to Convert or Dismiss**

93.     During the Second Interim Period, the UST filed an application to convert or dismiss the Debtor's chapter 11 case [ECF No. 154]. The City joined in the application.

94.     In connection with that motion, Goetz Fitzpatrick prepared opposition papers including a memorandum of law. The Bankruptcy Court held an extensive hearing on June 29, 2012, after which the parties (UST, Debtor, MNB and the City) discussed a global resolution, much of which occurred during the Second Interim Period.

95.     The UST's motion to convert or dismiss was ultimately resolved and a conditional consent order was extensively negotiated and entered by the Court (albeit after June 30, 2012). The Debtor may now proceed towards the confirmation of its plan as a result of the settlement and the work performed by Goetz Fitzpatrick.

**K.** **Plan and Disclosure**

96.     As detailed above, during the Second Interim Period, Goetz Fitzpatrick LLP has been intimately involved in discussions between the Debtor and entities seeking to purchase the Debtor's existing signs.

97.     In addition to participating in these negotiations, Goetz Fitzpatrick LLP has reviewed a litany of documents, pleadings, financial information – both historical and present, claims and other material, in preparation for drafting the Debtor's Plan and Disclosure Statement.

98.     Goetz Fitzpatrick LLP has met with the Debtor and its accountants on numerous occasions to distill all of the relevant information required to be provided in a plan and disclosure statement.

99.    As previously mentioned, Goetz Fitzpatrick drafted, edited and finalized a comprehensive plan and disclosure statement which were docketed on June 22, 2012. The Court has now scheduled a hearing on the adequacy of the disclosure statement for August 9, 2012.

**J.    Expenses**

100.    The Time Records also delineate the nature of reimbursements sought during the Final Interim Period.

101.    Goetz Fitzpatrick LLP has been required during the course of its retention to outlay funds for actual and necessary purposes.  Charges for express or overnight mail were used only when first class mail was impractical, such as when a response was required within an immediate deadline.  The firm did not charge the Debtor for the cost of overhead expenses. These expenses are fully documented on Exhibit "B" hereto.

## VI.    STATUTORY BASIS FOR RELIEF REQUESTED

102.    The statutory basis for relief sought herein are sections 330 and 331 of Title 11 of the Bankruptcy Code and Bankruptcy Rule 2016, as supplemented by the Local bankruptcy Rules.   Under sections 330(a)(3)(A) of the Bankruptcy Code, a Court shall consider the following factors in determining whether the amount of compensation requested is reasonable:

(A)    the time spent on such services;

(B)    the rates charged for such services;

(C)    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered towards the completion of, a case under this title;

(D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue, or task addressed; and

(E)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

*See* Section 330(a)(3)(A) of the Bankruptcy Code.

103.     The philosophy underlying the adoption of section 330 of the Bankruptcy Code is equally applicable to interim compensation.  The Bankruptcy Code provides that the same consideration apply to making interim awards of compensation under section 331 as to final allowances under section 330.  See In re Public Service Co. of New Hampshire, 93 B.R. at 826; In re International Horizons, Inc., 10 B.R. 895 (Bankr.N.D.Ga. 1981).  Section 331 of the Bankruptcy Code provides:

> A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date as is provided under section 330 of this title.  After notice and a hearing, the Court may allow and disburse to such applicant such compensation or reimbursement.

11 U.S.C. §331.

104.     It is respectfully submitted that the compensation and expenses sought herein by Goetz Fitzpatrick LLP should be allowed based on the above standard. The rates charged are typical of other comparably skilled practitioners, and the amount of time spent was reasonable in light of the nature of the issues presented and the complexity of the administration of the Debtor's case. The services provided were both necessary and beneficial to the administration of the case, the estate and the Debtor's creditors.

WHEREFORE, Goetz Fitzpatrick LLP respectfully requests that the Court enter an order granting this Application in its entirety and for such further and different relief as is just, proper and equitable.

Dated:    New York, New York
          July 24, 2012

Respectfully submitted,

Goetz Fitzpatrick LLP

By:   /s/Gary M. Kushner
      Gary M. Kushner
      A Partner of the Firm
      One Pennsylvania Plaza, 44th Floor
      New York, New York 10119
      (212) 695-8100

k:\kushner\otr - chapter 11\chapter 11\second interim application of gf for compensation.docx