Gary M. Kushner
Scott D. Simon
GOETZ FITZPATRICK LLP
One Penn Plaza, 44th Floor
New York, New York 10119
Tel: (212) 695-8100
gkushner@goetzfitz.com
ssimon@goetzfitz.com
*Attorneys for Debtor*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                               Chapter 11

OTR MEDIA GROUP INC.,                                Case No. 1-11-47385 (ESS)

                            Debtor.
------------------------------------------------------------X

**SECOND INTERIM APPLICATION OF NOVACK BURNBAUM CRYSTAL LLP AS DEBTOR'S SPECIAL COUNSEL FOR ALLOWANCE OF COMPENSATON FOR PROFESSIONAL SERVICES RENDERED AND FOR REIMBURSEMENT OF <u>ACTUAL AND NECESSARY EXPENSES INCURRED</u>**

TO THE HONORABLE ELIZABETH S. STONG,
 UNITED STATES BANKRUPTCY JUDGE:

       Novack Burnbaum Crystal LLP (sometimes referred to herein as "NBC"), as the Debtor's special counsel, hereby submits its second interim application (the "Application"), pursuant to §§330(a) of title 11, United States Code (the "Bankruptcy Code") and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for allowance of interim compensation for professional services performed and for reimbursement of expenses made on behalf of the Debtor for the period between July 1, 2012 and July 31, 2013 (the "Second Interim Period"). In support of the Application, the Debtor respectfully represents as follows:

## I. RELIEF REQUESTED

1. By this Application, the Debtor seeks entry of an order awarding interim compensation to NBC, as special counsel for the Debtor, in the sum of $55,314.93 for fees for professional services rendered during the Second Interim Period.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§ 157 and 1334. This is a "core" proceeding pursuant to 28 U.S.C. §159(b). Venue of these proceedings and over this Application are proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

3. The professional services for which allowances are sought by NBC in this application were rendered on behalf of the Debtor.

4. NBC maintains records of the time it has expended for professional services on behalf of a client, as well as records for expenses that were paid on behalf of a client.

5. NBC's time records were made concurrently with the rendition of the professional service rendered for the benefit of the Debtor. Each time entry made by NBC is reflected on Exhibits "A," "B," "C," and "D" annexed hereto.

## III. PROCEDURAL HISTORY

6. NBC initially applied for retention as part of the Debtor's application to retain ordinary course professionals on November 15, 2011 [See ECF No. 51, the "OCP Application"].

7. NBC did not and has not received any pre-petition or post-petition retainer from or on behalf of the Debtor.

8. The OCP Application was opposed, then adjourned to permit the parties-in-interest to reach agreement on the terms and scope of OCP retention.

9. NBC, which was at the time representing the Debtor in an appeal before the Appellate Division, needed assurance that it would be authorized to continue such representation at the appeal hearing scheduled for December 2011.

10. Accordingly, Debtor's counsel consulted with the Office of the United States Trustee. The decision was made to submit a separate retention application on behalf of NBC alone.

11. The application to employ NBC was filed on December 2, 2011 [ECF No. 62] and granted on December 6, 2011 [ECF No. 65], though, at the time, NBC had not requested compensation during these proceedings.

12. On April 24, 2012, the Court granted the OCP Application and issued an Order Authorizing the Debtor to employ professionals – including, *inter alia*, NBC – used in the ordinary course of business [ECF No. 128, the "OCP Order"].

13. The OCP Order capped NBC's monthly compensation at $6,000 per month, regardless of the amount of services NBC provides to the Debtor each month.

14. On July 19, 2012, the Debtor filed the first interim application for compensation on behalf of NBC for the period between the Petition Date and June 30, 2012 [ECF No. 212] which by agreement with the UST, was to be separately filed apart from the OCP Order.

15. On September 4, 2012, the Court entered an Order [ECF No. 256] granting NBC's first interim application and thereby authorizing the Debtor to pay NBC 70% of the total fees sought in the first interim application and 100% of the expenses sought in the first interim application.

16. In February, March, April, May and June 2013, NBC submitted compensation requests pursuant to the OCP Order [ECF Nos. 323, 352, 370, 409, and 441, respectively] for the amount of its fees up to the monthly cap provided by the OCP Order.

17. The OCP Order provides that the Debtor is authorized to pay 80% of the fees requested by a compensation request, provided that no party-in-interest objects.

18. No party objected to NBC's compensation requests for February, March, April, May, and June 2013 and, accordingly, NBC was paid approximately $4,800 for each $6,000 compensation request for each of those months. Assuming no objection, NBC will be paid approximately $4,800 (80% of $6000) for its July 2013 compensation request which was submitted by NBC on August 1, 2013

19. NBC now seeks the Court's approval of its compensation for the Second Interim Period, covering amounts that were not paid pursuant to the OCP Order.

20. Up through April 30, 2013, NBC's monthly statement to the Debtor was limited by NBC to no more than $6000 for fees, plus expenses, although actual fees exceed that amount. Any amount above the approximately $6000 that NBC reflected on its monthly statement was reflected on a separate statement entitled "Post Bankruptcy Work (Time Not Billed for January 1, 2013 to April 30, 2013), in the amount of $22,259.59, which is annexed hereto as Exhibit "A," and as to which NBC now requests payment as part of the interim application.

21. Beginning for time charges incurred in May 2013, NBC began billing all time charges (although pursuant to the OCP Order, NBC would only be paid for fees up to $6000, at 80%). NBC at this time seeks payment for its fees above the approximately $6000 per month reflected on its statements for May, June, and July 2013. The May 2013 Statement for work on the Covenant House matter, a copy of which is annexed hereto as Exhibit "B" reflects total fees

4

of $13,856.38 and NBC requests payment of the $7,856.38 in excess of the amount authorized by the OCP. The June 2013 Statement for work on the Covenant House matter, a copy of which is annexed hereto as Exhibit "C" reflects total fees of $19,685.43 and NBC requests payment of the $13,685.43 in excess of the amount authorized by the OCP. During July 2013, NBC incurred fees of $6,226.53 on the BSA/Omnibus EP matter (statement annexed hereto as Exhibit D hereto), which relates to assistance and evaluation of OTR's several cases presently before the BSA and the consideration of a possible action to be brought under 42 U.S.C. § 1983. During July 2013, NBC also incurred fees of $5,287.00 on the Covenant House matter. OTR has separately applied for payment of those fees plus $713.00 of the BSA/Omnibus matter fees for a total of $6000.00 under the OCP; the amount of the BSA/Omnibus fees included in this application is thus $5,513.53.

22. Thus, NBC's total second interim fee request is, thus, $55, 314.93.

## IV. DEBTOR'S SPECIAL COUNSEL

23. NBC is a full-service law firm that is focused on transactional matters and complicated court cases for businesses and individuals in diverse areas of the law, including regulatory law, complex corporate transactions, commercial law, and real property law. The attorneys of the firm have significant litigation and transactional expertise and have handled many regulatory proceedings in the sign industry regulated by the City of New York.

24. The professional services that NBC has performed and is performing on behalf of the Debtor since the filing of Debtor's Petition include, among other things, the litigation of matters of regulatory law including (i) an Article 78 proceeding for the Debtor's sign at 174 Canal Street in New York State Supreme Court; (ii) an Article 78 proceeding for the Debtor's sign at 538 10th Avenue, (iii) an appeal relating to the Debtor's sign at 838 Sixth Avenue; (iv)

advice involving the Debtor's sign at 59 4th Avenue; (v) other litigation involving signs; and (vi) involvement with general regulatory matters involving the Debtor's sign locations including a sign at Walter Avenue, Bronx, New York, (vi) advice and assistance with respect matters before the BSA, and (vii) consideration of the advisability of brings an action on behalf of debtor under 42 U.S.C. § 1983.

## IV. FACTUAL BACKGROUND

25. On August 25, 2011, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

26. No trustee, examiner or committee of creditors has been appointed in this case.

27. The Debtor is a full service outdoor advertising company as defined by the New York City Administrative Code, now in its second decade of operation. The Debtor provides bulletins, wallscapes and spectaculars in prime real estate locations covering the New York City market. The Debtor also provides media sales and billboard maintenance services to its advertising clientele.

28. The Debtor's chapter 11 filing was precipitated by, among other things, fines and legal expenses in connection with New York City's promulgation and enforcement of zoning regulations that effectively banned the Debtor from maintaining certain signs (the "Sign Laws"). The fines, legal expenses, and loss of revenue have severely interfered with the Debtor's relationship with landlords of various buildings which are used to place outdoor signs. The City's enforcement scheme has restricted the Debtor's available advertising sources and created substantial cash flow issues since the City served restraining notices on the Debtor's clients.

29. The chapter 11 filing was elected to obtain the benefits of the automatic stay and a breathing spell from the City's selective effort to put the Debtor out of business and to preserve the Debtor's relationships and assets for the benefit of its landlords, vendors, clients and other creditors.

### V. SIGNIFICANT SERVICES PERFORMED BY NBC DURING THE SECOND INTERIM PERIOD

30. The following is a summary description of the significant services performed by NBC during the Second Interim Period. All of the professional services provided by NBC on behalf of the Debtor during the Second Interim Period are set forth in its time records (Exhibits "A" through "D" hereto) (the "Time Records"). The Court is respectfully referred to the Time Records for specific details of the work performed by NBC during the Second Interim Period.

#### A. Litigation and Regulatory Matters

31. As previously noted, NBC served as special counsel on certain litigation matters involving the Debtor's sign locations. The most significant efforts by NBC during the Second Interim Period were in connection with the Debtor's sign at 174 Canal Street, New York, New York and the Debtor's sign at 538 10th Avenue, New York, New York.

**(i) Sign Location – 174 Canal Street, New York, New York**

32. This proceeding involved premises located at 174 Canal Street, New York, New York (the "Premises"). OTR, pursuant to a lease agreement with the owner ("Owner") has a right to place advertising signage (the "Sign") on the west wall (the "Wall") of the Premises. On September 12, 2012, DOB issued an "Intent to Revoke Approval(s) and Permit(s), Order(s) to Stop Work Immediately" (the "Letter of Intent") which initiated a DOB audit (the "Audit") of

7

the existing sign permit ("Permit") for the Premises, issued in March 2008, which permitted a the repainting of an existing grandfathered advertising wall sign (the "Sign") at the Premises.

33. The Letter of Intent contained a stop work order ("SWO") prohibiting OTR and the Owner from performing work necessary to replace the existing painted Sign with a new painted Sign as allowed by the Permit and as required by OTR's obligations to its client.

34. In January 2013, Phyllis Arnold, Esq., of Bryan Cave, LLP, representing OTR in the effort to legalize its sign inventory, wrote to Edward Fortier, Esq. of DOB, to request that the SWO be lifted temporarily. Mr. Fortier refused. Mr. Fortier's response made it clear that (a) DOB would shortly revoke the Permit and (b) if the Court did not act, OTR would be irreparably harmed by its continued inability to post a new Sign at the Premises by virtue of the SWO and the threat of additional violations during the pendency of its appeal to the Board of Standards and Appeals ("BSA") to challenge DOB's action. OTR believed that this legal limbo threatened its very viability.

35. Section 645 of the New York City Charter and §28-105.1 and §28-105.10 of the Admin. Code give the Commissioner of DOB the power to issue a permit and also to revoke a permit when it was issued by mistake or based on misinformation. Sections 648 and 666 of the Charter make those DOB final determinations appealable to the BSA. Admin. Code 28-207.2 authorizes issuance of an SWO in only two instances: where work is being done (a) in violation of law or (b) in a dangerous or unsafe manner.

36. Although DOB thus informed OTR of its position it had not, at the time, issued its final determination revoking the Permit. As soon as it did, OTR appealed to the BSA. But at that moment, OTR was caught in a pending matter at DOB that had lasted some four months and that it believed threatened to put it out of business.

37. OTR's position was that the City and DOB had abused their powers by issuing an SWO because there was no basis for finding that the existence of the Sign or the performance of work required to replace it with a new Sign had been or would be done in violation of law or in a dangerous or unsafe manner.

38. OTR utilized NBC to bring an Art. 78 proceeding seeking an order pursuant to CPLR 7805, staying the City Respondents immediately and during the pendency of the BSA proceeding from (i) enforcing the then current SWO or issuing and enforcing any further SWO that prevents OTR from installing a Sign on the Wall, and (ii) issuing new violations or seeking to enforce or prosecute existing violations against the Owner with respect to the Sign, on the ground that such actions would constitute actions in excess of their jurisdiction and would be arbitrary and capricious.

39. NBC researched the issue and prepared a Verified Petition and Memorandum of Law, showing that the City Respondents had no right to issue and had no right to enforce the SWO because there was no basis for finding that the existence of the Sign or the performance of work required to replace it with a new Sign had been or would be done in violation of law or in a dangerous or unsafe manner. The only proposed bases were zoning violations, none of which involve peril to life or property and all of which were refuted by the evidence that the Sign was grandfathered under zoning. OTR argued in its papers that a continued SWO would cause OTR irreparable harm by preventing it from satisfying its obligations to clients who contracted for the posting of advertising signs on the Premises.

40. OTR further argued in the papers prepared by NBC that while Section 648 of the City Charter generally requires an appeal to the BSA before relief can be sought in court, exhaustion of administrative remedies was not required for several reasons. First, it was argued

that "where no factual issue is raised . . . action may be maintained to challenge the validity or application of a particular statute without exhausting administrative remedies." Second it was argued that "[a]lthough the doctrine of exhaustion of administrative remedies normally requires that a party first exhaust all available administrative channels before looking to the courts for relief . . . , the exhaustion rule is not inflexible and need not be followed where to do so would be futile or would cause irreparable injury.

41. NBC's papers then went on, at length, to demonstrate how OTR would be irreparably harmed because a failure to enjoin DOB's enforcement of the SWO or issuance of additional violations would make it impossible for OTR to satisfy its obligations to existing clients and thus threaten the very viability of its reorganization plan, the irreparable injury standard has been met here.

42. NBC explained the applicable law concerning non-conforming uses and laid out the evidence that the facts supported a finding that the Sign should be grandfathered, demonstrating exhaustively the likelihood of OTR's success on the merits.

43. The Article 78 Petition was filed in New York State Supreme Court. Thereafter, NBC communicated at length with the DOB's Law Department in an effort to negotiate a stay pending the BSA appeal. DOB refused.

44. Accordingly, NBC scheduled a hearing with the New York court on its application for a stay.

45. After the Petition was filed, DOB took the position that this Court's July 19, 2012 Consent Order, and the parties' communications regarding DOB's issuance of violations as they relate to the Consent Order, created a process by which OTR would legalize or else abandon its signs, including filing the necessary documentation with DOB, and the steps OTR would take in

order to challenge DOB determinations that a sign was not legal (see paragraphs 1-10), arguing in particular that Paragraph 12 of the order protected DOB's authority to continue to issue violations with regards to OTR's signs, including the sign at issue in the instant proceeding, providing that "[n]othing in this Conditional Order delegates or limits the authority of DOB, BSA, LPC, or ECB to the extent such authority exists under applicable non-bankruptcy law."

46. DOB further argued that OTR had given up its right to challenge DOB's actions.

47. In response, NBC argued that while the Bankruptcy Court declined to grant such a stay, the Bankruptcy Court never ruled that OTR could not seek a stay in State court.

48. Unfortunately, after the Petition had been prepared and filed, and initial argument had, as indicated above taken place, OTR learned that one of its sign hangers had inadvertently replaced the sign at issue. This action rendered moot the questions that had been central to the Petition and, therefore, a decision was made to voluntarily discontinue the Article 78 proceeding.

**(ii)  Sign Location – Covenant House, New York, New York**

49. OTR has a right to place advertising signage on the south wall (the "Wall") of 538 10th Avenue (a/k/a 460 West 41st Street) (the "Premises") pursuant to a lease with non-party Covenant House New York ("Covenant House"), a New York not for profit corporation serving homeless, runaway and at-risk youth.

50. On or about May 7, 2013, OTR filed an appeal ("BSA appeal") with the New York City Board of Standards and Appeals ("BSA") from a Determination of DOB denying OTR's request to obtain a permit as a legal non-conforming use for an advertising sign (the "Sign") that has been present on the south Wall (the "Wall") of the Premises since at least 2004.

51. Immediately thereafter, NBC was asked by Debtor to prepare and file a Verified Petition seeking an order, pursuant to CPLR 7805, staying the Respondents during the pendency

of the BSA Appeal from (i) preventing OTR, and the owner of the Premises, Covenant House New York, a not for profit corporation serving homeless, runaway, and at risk youth, from placing a painted Sign on the Wall similar to the ones that have existed historically or (ii) issuing new violations or seeking to enforce or prosecute existing violations with respect to the Sign.

52. The basis of the Petition is that the DOB's determination was "affected by an error of law [and] was arbitrary and capricious."

53. In its Petition, OTR put forth the novel argument that the possibility that it may not be able to emerge from bankruptcy because of the economic hardship it is suffering by reason of the fact that it cannot use the Sign constitutes irreparable harm justifying the court finding that it is not required to exhaust its administrative remedies before coming to court and therefore the entry of a CPLR 7805 stay during its appeal to BSA. OTR further shows irreparable harm flowing from the fact that since in or about June 2012, it has lost more than $400,000 in lost rent, plus continuing monthly income of $45,000 per month in future lost rent and the loss of its ability to serve its clients and to present itself to prospective customers as a vibrant company. OTR further shows that Covenant House has and continues to be damaged in that it has lost and continues to lose rent due and payable by OTR of $8200 per month (from June 2012 to now, $82,000 in lost rental income has been suffered by Covenant House) and, if OTR is unable to emerge from bankruptcy, Covenant House will lose prepetition rent in the amount of $38,475.49 for a present total of over $120,000, which continues to grow every month.

54. In OTR's Petition, it shows that on or about October 4, 2012, Raymond Lucchi, RA filed an application seeking an approval and permit for a non-illuminated advertising sign measuring 3,300 square feet on the south wall of the Building. The Application was disapproved November 26, 2012.

55. Thereafter, OTR appealed the disapproval internally with the DOB by submission of a ZRD-1 on or about December 18, 2012. OTR argued that the Sign should be found a lawful non-conforming use based on Zoning Resolution §42-58 because it had existed in its present form before December 13, 2000.

56. On or about April 9, 2013, DOB issued its Determination denying that request. According to the DOB:

> The painted advertising sign erected in 2000 never obtained non-conforming status because . . . it was erected and existed in violation of then-ZR 42-53 . . . [which prohibits advertising signs] . . . in Manufacturing Districts . . . within 200 feet of an arterial highway . . . Beyond 200 feet from such arterial highway . . . . an advertising sign shall be located at a distance of at least as many linear feet therefrom as there are square feet of surface area on the face of such sign."
>
> The [Sign] was located within 200 feet and within view of an arterial highway.
> . . . .
>
> Additionally, even if the [Sign] did not violate the then-ZR 42-53 prohibition on advertising signs within 200 feet of and within view of arterial highways, the advertising sign would still have been unlawfully erected and existing in the M1-5 district because it violated the surface area requirements of then-ZR 42-53 for advertising signs beyond 200 feet of and within view of arterial highways . . . . [because it] can be viewed from a specific point on the arterial highway in any direction, 360 degrees (i.e. whether it is the driver of a car who is facing forward, or a passenger in the back seat of a car facing to the side or the rear, or a passenger in the back seat of a convertible facing the side or rear, etc.) . . . . Therefore, the [Sign] would have been unlawfully erected and existing in the M1-5 zoning district based on its' surface area of 3300 square feet and as such, the [Sign] could not have obtained lawful non-conforming status on this basis alone.

> Finally, [assuming the arterial highway issue were not dispositive], because ZR 42-58 only grants non-conforming status to those signs erected with a permit and the Sign on and prior to December 13, 2000 [was a painted sign that did not require a permit], non-conforming status [cannot be granted on that basis].

57. OTR goes on, in its Verified Petition to show that it is entitled to reversal by the BSA because DOB was (a) wrong in subjecting the Sign to treatment as an arterial highway sign, and (b) therefore, completely ignored the fact that the Sign is entitled to legal non-conforming status under ZR 52-11.

58. DOB filed opposing papers in which it argued (a) the Consent Order entered in Bankruptcy Court prohibits application to this Court at this time, (b) OTR failed to exhaust its administrative remedies with respect to the Stop Work Order, and (c) OTR cannot demonstrate either likelihood of success on its claims or irreparable harm sufficient to justify the entry of a CPLR 7805 stay. NBC prepared and served a detailed reply to DOB's position.

59. On July 2, 2013, NBC and DOB's counsel appeared for argument as to whether an interim stay should be granted. The Court denied the stay without prejudice, and ordered that OTR exhaust its administrative remedies. The Court clearly was not impressed with the City's position that the Consent Order barred the proceeding but did not believe that the losses OTR is suffering by reason of inability to use the sign at this time constituted irreparable harm sufficient to justify a finding that OTR did not have to complete its appeal to BSA before seeking relief in Supreme Court.

    C.    **<u>Expenses</u>**

60. The Time Records do not set forth any expenses for the Second Interim Period.

### VI.     <u>STATUTORY BASIS FOR RELIEF REQUESTED</u>

61. The statutory basis for relief sought herein are sections 330 and 331 of Title 11 of the Bankruptcy Code and Bankruptcy Rule 2016, as supplemented by the Local bankruptcy

Rules. Under sections 330(a)(3)(A) of the Bankruptcy Code, a Court shall consider the following factors in determining whether the amount of compensation requested is reasonable:

> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered towards the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue, or task addressed; and
>
> (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

*See* Section 330(a)(3)(A) of the Bankruptcy Code.

62. The philosophy underlying the adoption of section 330 of the Bankruptcy Code is equally applicable to interim compensation. The Bankruptcy Code provides that the same consideration apply to making interim awards of compensation under section 331 as to final allowances under section 330. See In re Public Service Co. of New Hampshire, 93 B.R. at 826; In re International Horizons, Inc., 10 B.R. 895 (Bankr.N.D.Ga. 1981). Section 331 of the Bankruptcy Code provides:

> A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date as is provided under section 330 of this title. After notice and a hearing, the Court may allow and disburse to such applicant such compensation or reimbursement.

11 U.S.C. §331.

15

63. It is respectfully submitted that the compensation and expenses sought herein should be allowed based on the above standard. The rates charged are typical of other comparably skilled practitioners, and the amount of time spent was reasonable in light of the nature of the issues presented and the complexity of the administration of the Debtor's case. The services provided were both necessary and beneficial to the administration of the case, the estate and the Debtor's creditors.

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting this Application in its entirety, and for such further and different relief as is just, proper and equitable.

Dated: New York, New York
       August 29, 2013

                        Goetz Fitzpatrick LLP
                        *Attorneys for the Debtor*

               By: /s/Scott D. Simon
                   Gary M. Kushner
                   Scott D. Simon
                   One Pennsylvania Plaza
                   44th Floor
                   New York, New York 10119
                   (212) 695-8100

T:\Kushner\KDrive\Kushner\OTR - CHAPTER 11\chapter 11\Second Interim Application of Novack Burnbaum For Compensation 8 1 13.docx