Gary M. Kushner
Scott D. Simon
GOETZ FITZPATRICK LLP
One Penn Plaza
New York, New York 10119
Tel: (212) 695-8100
gkushner@goetzfitz.com
ssimon@goetzfitz.com
*Attorneys for Debtor*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re:                                                    Chapter 11

OTR MEDIA GROUP INC.,                          Case No. 1-11-47385 (ESS)

                                    Debtor.
------------------------------------------------------------X

**FINAL APPLICATION OF BRYAN CAVE, LLP
FOR ALLOWANCE OF COMPENSATION FOR PROFESSIONAL SERVICES
RENDERED AND FOR REIMBURSEMENT OF ACTUAL AND
NECESSARY EXPENSES INCURRED**

TO:    THE HONORABLE ELIZABETH S. STONG,
         UNITED STATES BANKRUPTCY JUDGE:

Bryan Cave, LLP ("Bryan Cave"), special counsel for OTR Media Group Inc., the debtor

and debtor-in-possession (the "Debtor"), files this application (the "Application"), pursuant to

§ 330(a) of title 11, United States Code (the "Bankruptcy Code") and Rule 2016 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for allowance of final compensation

for professional services performed and reimbursement of expenses for the period of June 1,

2012 through November 19, 2013 (the "Final Period"). In support of the Application, the Debtor

respectfully represents as follows:

-1-

# I.    SUMMARY OF RELIEF REQUESTED

1.      By this Application, Bryan Cave seeks entry of an order awarding final compensation in the sum of $351,563.96 for professional services rendered, inclusive of $38,778.81 for expenses incurred, as special counsel for the Debtor in this chapter 11 proceeding during the Final Period.

2.      This Application includes a request for (a) payment of the Bryan Cave Holdback (as defined below) in the amount of $62,568.90 for fees in connection with the Bryan Cave First Interim Application (as defined below); (b) fees and disbursements for the period December 1, 2012 through November 19, 2013 (the "Second Interim Period") in the amount of $250,216.25 for fees and $38,778.81 for reimbursement of expenses, respectively; and (c) final approval of the fees awarded to Bryan Cave with respect to the Bryan Cave First Interim Application, pursuant to which Bryan Cave was paid a total of $93,853.35 for fees and $1,190.11 for expenses.

3.      The professional services for which interim allowances are sought by Bryan Cave were rendered on behalf of the Debtor. Bryan Cave received no retainer for services to be rendered on behalf of the Debtor. Bryan Cave received no compensation for the professional services rendered in connection with this case, except as set forth in this Application.

4.      Bryan Cave maintains records of the time expended in the rendition of all professional services, as well as records for expenses that were required to be paid on behalf of the Debtor (the "Time Records").

5.      Bryan Cave's Time Records were made concurrently with the rendition of the professional services and the expenditures made for the benefit of the Debtor. These records are set forth in Exhibit "A" annexed hereto and are incorporated by reference.

### a. First Interim Application

6. By application dated February 25, 2013 (ECF No. 333, the "Bryan Cave First Interim Application"), Bryan Cave requested interim compensation in the amount of $156,422.25 for fees and $1,190.11 for reimbursement of expenses incurred as special counsel for the Debtor during the period June 1, 2012 through November 30, 2012 (the "First Interim Period").

7. By Order dated March 15, 2013 (ECF NO. 357), the Bryan Cave First Interim Application was granted to the extent of awarding Bryan Cave fees in the amount of $93,853.35 and expenses of $1,190.11, without prejudice to make a further application for payment of sums requested but not awarded.

8. The Court directed a holdback of payment of fees requested in the Bryan Cave First Interim Application such that $62,568.90, representing 40% of the total request for fees, was not paid to Bryan Cave (the "Bryan Cave Holdback").

### II. QUALIFICATIONS OF BRYAN CAVE

9. The Court approved Bryan Cave's retention application by Order dated August 29, 2012 [ECF No. 254]. Bryan Cave's retention was effective as of June 1, 2012.

10. Bryan Cave, LLP is a leading business and litigation firm that does transactional, regulatory, and litigation work for a diverse client base, including businesses, financial institutions and not-for-profit organizations, government entities, and individual clients. The more than 1,100 lawyers and consulting professionals affiliated with the firm have extensive legal experience.

11. Bryan Cave was retained in the Debtor's case to secure the services of Phyllis Arnold, whose experience is particularly relevant to the Debtor's request for assistance, as the

Debtor's needs involve interacting with the New York City (the "City") Department of Buildings and other City personnel with respect to the City's claims arising from enforcement of zoning restrictions governing outdoor advertising signs. Ms. Arnold is a former General Counsel and Deputy Commissioner at the Department of Buildings and is intimately familiar with the enforcement program at issue

### III.   SUMMARY OF SERVICES PERFORMED

12.     During the Second Interim Period, Bryan Cave provided the following legal services on the Debtor's behalf, specifically representing the Debtor in connection with (i) assessment and pursuit of settlement opportunities for liabilities arising from the Department of Buildings' enforcement of the City's Zoning Resolution against certain of the Debtor's signs and (ii) administrative submissions required to legalize, to the extent possible, the Debtor's remaining sign inventory.

13.     In particular, Ms. Arnold's reputation and experience was integral in the Debtor's negotiation of the consent order dated July 19, 2012 (ECF No. 214, the "Consent Order") by which the Debtor settled the motion of the Office of the United States Trustee (the "UST") to convert the Debtor's case (the "UST Motion").

14.     Pursuant to the Consent Order, Ms. Arnold reviewed the Debtor's entire sign inventory to determine whether each sign complied with applicable laws, rules and regulations and to determine whether there was a reasonable likelihood that the Debtor could marshal and submit sufficient evidence to the City that the sign would be legalized by the Department of Buildings. In so doing, Ms. Arnold produced a report which set forth her determinations and provided a road map for the Debtor's case to follow (as amended, the "Arnold Report").

15.     Following dissemination of the Arnold Report, Bryan Cave assisted the Debtor by

researching photographs and other evidence demonstrating a basis for grandfathering the Debtor's signs, then helped prepare the documentary package for each sign submitted to the Department of Buildings.

16. Ms. Arnold also engaged in discussions and correspondence with the Department of Buildings with respect to the sufficiency of the evidence presented by the Debtor and supported the Debtor's bankruptcy counsel at Court hearings.

## IV. **FACTUAL BACKGROUND**

17. On August 25, 2011, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

18. No trustee, examiner or committee of creditors has been appointed in this case.

19. The Debtor is an outdoor advertising company whose sole business is the solicitation, arrangement and placement of outdoor advertising displays in the New York metropolitan area.

20. The Debtor's chapter 11 filing was precipitated by, among other things, fines and legal expenses in connection with New York City's promulgation and enforcement of zoning regulations that effectively banned the Debtor from maintaining certain signs. The fines, legal expenses, and loss of revenue restricted the Debtor's trade credit and created substantial cash flow issues.

21. The Debtor was in the process of implementing a comprehensive restructuring plan designed to enhance its operational capacity and refinance its secured debt obligations, which would have allowed it to emerge from chapter 11 protection and continue to provide advertising services in the New York area.

22.     The Debtor now seeks to exit chapter 11 by way of application for dismissal of its bankruptcy case pursuant to § 1112(b) of the Bankruptcy Code because the time required to exercise its state law rights and remedies during the pendency of its chapter 11 case would prejudice the Debtor's creditors.

## V.     REQUEST FOR ALLOWANCES OF COMPENSATION AND REIMBURSEMENT OF EXPENSES

23.     Bryan Cave has represented the Debtor with respect to a myriad of issues with respect to all of the Debtor's signs and sign locations.

24.     As of the Petition Date, the Debtor (or its affiliated LLCs) held an interest in 18 sign locations pursuant to written lease agreements with various property owners as follows (hereinafter referred to as the "Outdoor Advertising Leases" or "Leases"):

- 424 West 33rd Street, New York, NY
- 174 Canal Street, New York, NY
- 450 West 31st Street, New York, NY
- 860 Atlantic Avenue, Brooklyn, NY
- 261 Walton Avenue, New York, NY
- 84 Withers Street, Brooklyn, NY
- 945 Zerega Avenue, Bronx, NY
- 25 Skillman Street, New York, NY
- 330 Bruckner Blvd., Bronx, NY
- 838 6th Avenue, New York, NY
- 340 Flatbush Avenue, Brooklyn, NY
- 13 Carmine Street, Long Island City, NY
- 59 4th Avenue, New York, NY
- 101-111 East 161st Street, Bronx, NY
- 460 West 41st Street, New York, NY
- 207 Dyckman Street, New York, NY
- 445 West 35th Street, New York, NY
- 2437 Grand Concourse, Bronx, NY
- 209 Dyckman Street, New York, NY

25.     Over the past five years, the Debtor has faced substantial challenges to its business, principally because of changes in the City's zoning enforcement regime, which have

monopolized the Debtor's attention and drained much-needed capital.

26. During this time, the Debtor used a myriad of professionals to maintain compliance with the City's sign laws.

27. In 2001 and 2005, the City Council adopted Local Laws 14 and 31, which significantly amended the portion of the City's administrative code relating to outdoor advertising. These changes went into effect on August 25, 2006, when the Department of Buildings ("DOB") promulgated regulations, known collectively as rule 49, implementing the amendments (the "City's Advertising Registration").[1]

28. Among other things, in combination with the City's Zoning Resolution, the new rules (i) targeted for enforcement the ability of OACs, including OTR, to place advertising in close proximity to highways and parks, (ii) provided the DOB with the authority to impose fines of up to $25,000 a day for each of a wide variety of violations, and (iii) established burdensome procedures by which an OAC could seek non-conforming use status for its signs (the "Sign Scheme"). See Zoning Resolution §§42-55 and 32-662; Local Law 14/2001; Local Law 31/2005; 1 Rules of the City of New York §49. In sum, the new regulatory scheme dramatically reduced the amount of property on which OACs can place signs and thereby negatively affected the profitability of OACs, including OTR.

29. In general, advertising signs are not permitted in residential and most commercial zoning districts. They are allowed in C6-5, C6-7, C7, C8, and M zoning districts and are subject to size, illumination, height, and projection restrictions. ZR §32-63; §42-52. The placement of advertising signs near arterial highways and parks is further regulated by special provisions of the Zoning Resolution dating to the 1940s.

30.     A lawful use of property that is no longer authorized due to a change in zoning is nonetheless permitted to continue as a "grandfathered", non-conforming use subject to certain limitations. ZR §52-11. The use must be shown to have been lawfully established and it must continue. Zoning Resolution §52-61 provides that, if the active operation of substantially all the non-conforming uses in a building is discontinued, the non-conforming use is extinguished and the building can be used only by conforming uses. See Matter of Toys "R" Us v. Silva, 89 NY2d 411, 417-418 (1996).

31.     Advertising signs given non-conforming use status are thereafter governed by ZR§52-83. That section allows structural alteration, reconstruction, and replacement of such signs as long as there is no creation of a new or an increase in the degree of non-conformity, and no increase in surface area or degree of illumination.

32.     In the districts in which they are permitted, advertising signs in proximity to arterial highways and parks are regulated differently from other advertising signs. First, no advertising signs are permitted within 200 feet of and within view of an arterial highway or public park. ZR §32-662; §42-55(a)(2).[2] [3] Second, an existing advertising sign within 200 feet of an arterial highway or park may not be structurally altered, relocated, or reconstructed. This section does not prohibit repairing or refurbishing such a sign. Beyond 200 feet, signs permitted by the underlying zoning district may be increased in size one square foot for each linear foot the

---

[1] These provisions include New York City Administrative Code ("NYCAC") Article 28, Chapter 5, Rules of the City of New York ("RCNY") Title 1, Sections 49 and 102, and various provisions of the New York City Zoning Resolution.
[2] In order to be captured by the arterial highway restrictions, an arterial must be shown on the Master Plan of Arterial Highways and Major Streets, as "principal routes," "parkways" or "toll crossings", and must be designated by the City Planning Commission as arterial highways. Parks must have an area of one-half acre or more. ZR §32-662; §42-55.

[3] Non-advertising signs are permitted within 200 feet and within view of an arterial or park, but may be no larger than 500 square feet. ZR §32-661; 42-55(a)(1).

sign is located from the arterial or park. ZR §32-662; §42-55(b).

33.     The flip side of the restrictions imposed by the arterial highway provisions is reflected in their grandfathering allowances. In the late 1970s, the Zoning Resolution was amended to grandfather certain existing advertising signs. With respect to those commercial and manufacturing zoning districts that allow advertising signs, an existing advertising sign may be given legal non-conforming use status pursuant to ZR §52-83 if it is within 660 feet of the arterial and either (1) was erected, structurally altered, relocated, or reconstructed before June 1, 1968 or (2) was erected, structurally altered, relocated, or reconstructed between June 1, 1968 and November 1, 1979 and if its size does not exceed 1200 square feet of surface area, 30 feet in height and 60 feet in length. In the first instance, the sign is grandfathered to the extent of its size on May 31, 1968. In the second instance, it is grandfathered to the extent of its size on November 1, 1979. Zoning directs that the more restrictive of the provisions shall apply. ZR §32-662(1) and (2); §42-55(c) (1) and (2).

34.     Thus, for example, an advertising sign in a district that permitted advertising signs, that was located within 660 feet of an arterial, and that was erected before June 1, 1968 may remain under the terms of ZR §52-83 to the extent of its size on May 31, 1968. However, a similar sign erected between June 1, 1968 and November 1, 1979 may remain pursuant to ZR §52-83 to the extent of its size on November 1, 1979 so long as its size does not exceed 1200 square feet.

35.     There is another route to non-conforming use status for certain advertising signs. Zoning Resolution §42-58 provides that, in manufacturing zoning districts, advertising signs erected before December 13, 2000 shall have non-conforming use status pursuant to ZR §52-83 as to their surface area, illumination, projection, and height where the signs were issued permits

by the DOB on or before that date.

36.     The Administrative Code generally requires a permit to erect a sign or a sign structure. Ad. Code §28-105.2.6. However, signs painted directly on the exterior wall surface of a building are among those types of signs that do not require a permit. Ad. Code §28-105.4.5.1.

37.     There appears to be some question as to whether a finding of legal non-conforming use status requires a showing that the sign and/or the sign structure had a required permit on the date of non-conformance.[4] The Zoning Resolution defines a non-conforming use as

> any lawful use…which does not conform to any one or more of the applicable use regulations of the district in which it is located, either on December 15, 1961 or as a result of any subsequent amendment thereto.

ZR §12-10. The failure to obtain a permit does not implicate land use considerations informing zoning laws that protect existing uses from retroactive application of new restrictions. See Kennedy v. Zoning Board of Appeals, 205 AD2d 629 (2d Dep't 1994).

38.     On May 18, 2012, the UST moved to convert or dismiss the Debtor's chapter 11 case. The UST based its motion on the claim that the Debtor could not confirm a plan and that the Debtor has grossly mismanaged the bankruptcy case. The latter was premised on the Debtor's inability to file permit registrations and sign applications with DOB.

39.     On June 22, 2012, Metropolitan National Bank ("MNB") filed a response to the UST in which it generally opposed the conversion or dismissal of the Debtor's chapter 11 case. [ECF No. 177]. On June 27, 2012, the City filed its joinder to the UST Motion (ECF No. 186, the "City Joinder").

40.     The Debtor prepared an opposition to the UST Motion and the City Joinder,

which were filed on June 22, 2012 [ECF No. 181] and June 28, 2012 [ECF No. 193], respectively.

41.     A hearing on the UST Motion and the related pleadings was conducted by the Bankruptcy Court on June 29, 2012. The parties were amenable to adjourning the hearing on the UST Motion to discuss a resolution. The parties were ultimately able to agree to the Consent Order.

42.     As part of the negotiations, the Debtor agreed to retain Bryan Cave, and through it, Ms. Arnold, based on her history as former General Counsel and Deputy Commissioner at the NYC Department of Buildings. Her intimate familiarity with the enforcement program at issue was a key consideration in the Debtor's decision to focus its limited budget for professional services on Bryan Cave in connection with sign registrations.

43.     Pursuant to the Consent Order, the parties consented to utilize Ms. Arnold to review the viability of each of the Debtor's sign locations and preliminarily determine whether each sign complied with applicable law. Thereafter, Ms. Arnold was required to prepare and serve a report setting forth her determinations as to the lawfulness of each sign and the viability of each location.

44.     The Arnold Report was timely served by Ms. Arnold on the parties to the Consent Order on July 24, 2012, and subsequently amended on July 30, 2012 and August 6, 2012.

45.     Thereafter, pursuant to the Consent Order, OTR, with Bryan Cave's direct assistance, filed two sets of applications with DOB. The purpose of these filings is to legalize the signs with evidence establishing their lawful non-conforming use status under zoning--in other words, that they are "grandfathered." Typically, this involves assembling evidence that each sign was lawful when installed and that it has been in virtually continuous use since then.

---

[4] "Date of non-conformance" refers to the date on which the sign became prohibited.

46.     Specifically, in addition to demonstrating the lawful establishment of each sign, proving grandfathered status requires identifying the date when the sign became unlawful, known as the date of non-conformance, and proving continuous use from that date to the present. Generally, the date of non-conformance traces to a change in zoning and varies depending on the zoning history of the location and its proximity to arterial highways and public parks. It may be as recent as 2005 or as distant as the 1940s.

47.     OTR has spent the better part of the last year plus several months, with the assistance of Ms. Arnold and Bryan Cave, identifying and acquiring evidence, both in the public domain and controlled by third parties, to support its claims to lawful non-conforming use status.

48.     Bryan Cave and OTR staff members have scoured websites and public repositories for historical photographs. Pursuant to Rule 2004 requests, OTR and Bryan Cave have reviewed evidence of the historical use of several signs from Lamar Advertising, Vista Media, Fuel Outdoor, and Clear Channel (as the signs' prior owners), and OTR continues to pursue historical records that it believes these and other entities possess. Tracking down evidence of non-conforming use status has been a grueling process requiring painstaking follow-up in every case. Bryan Cave has diligently pursued this evidence.

49.     OTR's first set of filings at DOB, prepared with the direct assistance of Bryan Cave, was made on or about September 5, 2012, and was revised September 14, 2012. OTR filed 9 signs at the DOB Signs Enforcement Unit in Manhattan as part of its registration of its arterial sign inventory:

| Manhattan | Bronx | Brooklyn |
|---|---|---|
| 445 W. 35th Street | 111 E. 161st Street | 84 Withers Street |
| | 330 Bruckner Blvd. | 25 Skillman Ave (one face) |
| | 261 Walton Ave. | 25 Skillman Ave. (second face) |
| | 945 Zerega Ave. | |
| | 2437 Grand Concourse | |

The second set of filings was made between October 3 and October 4, 2012, when OTR, with Bryan Cave's assistance, filed at the respective DOB borough offices applications for permits for 5 signs:

| Manhattan | Bronx | Brooklyn |
|---|---|---|
| 538 10th Avenue | 111 E. 161st Street | 340 Flatbush Avenue Ext. |
| 838 6th Avenue | 330 Bruckner Blvd. | |

50.    DOB issued objections for all of the permit applications. In each case, these objections ultimately raised the issue whether the advertising sign is lawful under zoning

regulations. Pursuant to the Administrative Code and DOB practice, OTR's appearance at appointments with DOB afforded it the opportunity to respond to these objections by submitting evidence, compiled with Bryan Cave's assistance, to the plan examiner that the sign is grandfathered and is otherwise lawful.

51.     With respect to the registration of arterial signs, on or about October 3, 2012 DOB issued a Notice of Sign Registration Deficiency for each of the 9 locations, citing in each case OTR's failure to have demonstrated that the sign was lawfully established. OTR, with and through Bryan Cave, researched and compiled further evidence to present to DOB.

52.     The issue presented in the OAC registration process was also whether the sign is grandfathered.

53.     Notwithstanding OTR's good-faith efforts to utilize Bryan Cave to apply for registration and permitting of its signs pursuant to the Consent Order, DOB began proceedings to and did revoke multiple permits at 6 locations: 84 Withers Street; 174 Canal Street; 450 West 31 Street; 330 Bruckner Blvd.; 945 Zerega Avenue; and 2437 Grand Concourse. These proceedings were directed to the applicant who filed the permit in question and to the property owner, although OTR obviously has the primary interest in defending them.

54.     Accordingly, pursuant to DOB direction, OTR, with Bryan Cave's assistance, obtained authorizations from each of the property owners in question to represent their interests and to appear before DOB in these revocation proceedings. These proceedings took place at the borough level and also raised the question whether a particular sign is grandfathered. OTR with Bryan Cave's help, either by itself or with the applicant, appeared at DOB on these matters and attended additional related appointments during the First Interim Period.

55.     Following the DOB's actions, Bryan Cave filed seven appeals with the City's

Board of Standards and Appeals.  After withdrawing one such application, Bryan Cave has prosecuted the remaining six appeals on the Debtor's behalf:  174 Canal Street; 450 West 31 Street; 538 10 Avenue; 330 Bruckner Blvd; 945 Zerega Avenue; and 2437 Grand Concourse. The BSA has denied three appeals (174 Canal Street; 538 10 Avenue; and 945 Zerega Avenue); one appeal will likely be withdrawn following DOB's withdrawal of objections (2437 Grand Concourse); and two appeals remain to be decided (450 West 31 Street and 330 Bruckner Blvd). The Debtor and Bryan Cave continue to vigorously contest the City's determinations. As with the Debtor's successful appeal of the Fourth Avenue sign determination, Bryan Cave has advised the Debtor that it believes that a meritorious legal claim exists as to these rejections by the City.

56.     Generally, Ms. Arnold has attended multiple meetings with various DOB personnel regarding both OTR general sign outlook and specific OTR sign locations; drafted and submitted multiple packages of evidence to DOB; and counseled the Debtor with respect to its sign compliance. At BSA, Ms. Arnold drafted and filed BSA applications, attended meetings and hearings before BSA, and submitted additional evidence and supplemental documentation in connection with BSA appeals.

57.     Finally, DOB has recently issued to both OTR and to the respective property owners more than 75 ECB violations Ariel? citing infractions of both zoning and code. The violations were apparently observed in June of last? year and were served on OTR via the Secretary of State on or about October 15, 2012. In some cases, violations cite conditions that have since been corrected through the sign's removal pursuant to the Consent Order, as in the removal ordered for the sign at 209 Dyckman Street in Manhattan, which came down pursuant to the Consent Order. This needs an update from Ariel.

58.     Pursuant to the Consent Order and the Arnold Report, the Debtor removed all

advertising copy at each of the following Designated Signs and/or Locations (as such terms are defined in the Consent Order):

- 25 Skillman Avenue
- 207 Dyckman Street
- 13 Carmine Street
- 445 West 35th Street

59.     Pursuant to the Consent Order and the Arnold, the Debtor corrected unlawful aspects of otherwise viable displays (such as unlawful illumination or size) at each of the following Designated Signs and/or Locations (as defined in the Consent Order):

- 84 Withers Street
- 860 Atlantic Avenue
- 2437 Grand Concourse
- 424 West 33rd Street

60.     The Debtor, based on Bryan Cave's counsel believes that the balance of its inventory remains viable, legal, and capable of producing the following approximate monthly revenues:

- 84 Withers Street--            $24,200
- 860 Atlantic Avenue--          $12,500
- 209 Dyckman Street--           $11,400
- 261 Walton Street--            $47,000
- 330 Bruckner Blvd.--           $92,500
- 340 Flatbush Avenue--          $13,250
- 2437 Grand Concourse--         $11,150
- 424 West 33rd Street--         $32,500
- 838 6th Avenue--               $23,000
- 174 Canal Street--             $ 4,200
- 450 West 31st Street--         $25,000
- 13 Carmine Street--            $31,100
- 460 W. 41st Street--           $39,200
- 59 4th Avenue--                $31,100

61.     The final determination of the lawfulness of the Debtor's Signs will have a substantial impact on the Debtor's existing business.

62. In summary, a large part of Bryan Cave's time during the Second Interim Period was concentrated on the following services:

a. participate in multiple meetings, teleconferences and correspondence with DOB, Edward Fortier (DOB General Counsel) and Alan Kleinman (Corporation Counsel);

b. review, assess and research sign location information and evidence to support "grandfathering" and other aspects of the sign legalization process;

c. draft, edit and finalize legal arguments for various submissions to DOB, hearings before BSA and appellate and Bankruptcy Court;

d. research various aspects of the New York City Charter, Zoning Resolution, and Administrative Code;

e. draft, edit and finalize numerous regulatory applications associated with legalizing the Debtor's signs;

f. analyze permit audits and develop strategy for Debtor to respond;

g. review and analyze sign evidence for development of continuous use requirements under the Sign Laws;

h. provide periodic and regular assistance to professional team including Debtor's special counsel (Novack Burnbaum Crystal); Debtor's chapter 11 counsel and Debtor's counsel;

i. assist Debtor's counsel in developing and finalizing extensive plan of reorganization and related disclosure statement;

j. assist Debtor in document review, requests under Bankruptcy Rule 2004

and development of document requests needed for a myriad of sign applications;

k.  assist Debtor's counsel in responding to numerous Bankruptcy motions, including the City's motions to convert and to compel discovery;

l.  attend various court proceedings and regulatory hearings, including frequent motions before the Bankruptcy Court and BSA;

m.  participate in numerous telephone conferences and meetings with the Debtor's landlords and counsel; and

n.  assist Debtor's counsel regarding the content of the pre-hearing statement associated with the City's declaration of non-compliance.

63.  The professional services rendered by Bryan Cave demanded a high degree of professional competence and professional responsibility.

64.  Bryan Cave has sought to render professional services in an efficient and economical manner.

65.  For example, Bryan Cave has staffed the Debtor's case with a core group of professionals including Ms. Arnold, Judith Gallent, and Frank Chaney, all of whom performed a litany of legal tasks for the Debtor during the First Interim Period.

66.  In order to avoid overstaffing of the Debtor's case, Bryan Cave dedicated this core group of professionals who have performed substantially all of the legal services required by the Debtor. As such, Bryan Cave did not have to spend significant time or effort on bringing separate personnel up to speed on the Debtor's file.

## VI.  **EXPENSES**

67.  The Time Records also delineate the nature of reimbursements sought during the

Second Interim Period.

68.     Bryan Cave has been required during the course of its retention to outlay funds for actual and necessary purposes. Charges for express or overnight mail were used only when first class mail was impractical, such as when a response was required on an immediate deadline. Bryan Cave did not charge the Debtor for the cost of overhead expenses.  These expenses are fully documented on Exhibit "A" hereto

## VII.     STATUTORY BASIS FOR RELIEF REQUESTED

69.     The statutory basis for relief sought herein is sections 330 and 331 of Title 11 of the Bankruptcy Code and Bankruptcy Rule 2016, as supplemented by the Local bankruptcy Rules. Under sections 330(a)(3)(A) of the Bankruptcy Code, a Court shall consider the following factors in determining whether the amount of compensation requested is reasonable:

(A)     the time spent on such services;

(B)     the rates charged for such services;

(C)     whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered towards the completion of, a case under this title;

(D)     whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue, or task addressed; and

(E)     whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

See Section 330(a)(3)(A) of the Bankruptcy Code.

70.     The philosophy underlying the adoption of section 330 of the Bankruptcy Code is equally applicable to interim compensation. The Bankruptcy Code provides that the same consideration apply to making interim awards of compensation under section 331 as to final

allowances under section 330. <u>See In re Public Service Co. of New Hampshire</u>, 93 B.R. at 826;

<u>In re International Horizons, Inc.</u>, 10 B.R. 895 (Bankr.N.D.Ga. 1981). Section 331 of the

Bankruptcy Code provides:

> A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date as is provided under section 330 of this title. After notice and a hearing, the Court may allow and disburse to such applicant such compensation or reimbursement.

11 U.S.C. §331.

71.    It is respectfully submitted that the compensation and expenses sought herein by Bryan Cave should be allowed based on the above standard. The rates charged are typical of other comparably skilled practitioners, and the amount of time spent was reasonable in light of the nature of the issues presented and the complexity of the administration of the Debtor's case. The services provided were both necessary and beneficial to the administration of the case, the estate and the Debtor's creditors.

72.    The Debtor submits that the value of the services Bryan Cave rendered on behalf of the Debtor provided material benefits to the Debtor and its creditors. ????

73.    For those reasons, the Debtor submits that this Application for final allowances of Bryan Cave's compensation be granted.

74.    No prior application for the relief requested herein has been made to this Court.

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting this Application in its entirety and for such further and different relief as is just, proper and equitable.

Dated: New York, New York
      October 28, 2013

Goetz Fitzpatrick LLP
*Attorneys for the Debtor*

By:   /s/Gary M. Kushner
     Gary M. Kushner
     A Partner of the Firm
     Scott D. Simon
     One Penn Plaza
     New York, New York 10119
     (212) 695-8100

c:\users\qfd\appdata\local\temp\3\oxuj24tp\bryan cave final fee application.doc